Michael Tinkham, a minor, by Donald Tinkham, his next
friend and father, appellant, v. Marius L. Kole,
appellee.

No. 50268.

(Reported in 110 N.W.2d 258)

August 15, 1961.

1304

Hansen, Wheatcraft & Galvin, of Des Moines, for appellant.

Smedal & Maurer, of Ames, for appellee.

GARFIELD, C. J.—This is a law action in two counts by Michael Tinkham, a minor, through his father-next friend, to recover for personal injury resulting from corporal punishment by defendant, Marius L. Kole, a schoolteacher. For convenience we refer to the boy as plaintiff. Plaintiff's first count alleges negligence, the second assault and battery. At the close of plaintiff's evidence, the trial court directed a verdict for defendant on each count. Plaintiff's appeal from the judgment thereon assigns error in the ruling as to each count.

The vital question presented is whether reasonable minds might conclude from the evidence that the punishment administered by defendant was unreasonable or immoderate under the circumstances. We must answer in the affirmative.

I. Of course it is our duty to view the evidence in the light most favorable to plaintiff.

On October 2, 1958, plaintiff was a student in the eighth grade of the Nevada, Iowa, public school. He was 13, weighed about 110 and was about 5 feet, 2 inches tall. Defendant taught the last period of the day, from 2:30 to 3:30. Jerry Geisler, in the seat in front of plaintiff, was a member of the junior high band to whom white gloves had been issued. When Jerry took his seat he laid his books at the side of his desk and placed his gloves on the books. Plaintiff put the gloves on his hands. There is testimony this was before the bell rang to signal start of the class.

Jerry testifies: "I don't know whether Mr. Kole was in the room or not at that time, but he came in as soon as the bell rang. There wasn't too much order at that time. He [defendant] told us to take our books and most of us did who heard him with the

noise. He said, 'Michael, get those gloves off.' Michael started taking them off, one at a time, finger by finger. He said, 'Michael, hurry and get those gloves off.' Mike just kept going like that and he said, 'Mike, you better hurry and get those gloves off.' About that time, Mike took them off real fast, because Mr. Kole was back by his [plaintiff's] desk. Then Mr. Kole started hitting him about the head. He hit him quite a few times. Michael did not say anything to Mr. Kole until he stopped hitting him. He said, 'Are you going to do that again?' Michael said, 'No.' Several times he said it and Mr. Kole started hitting him again for not too long a time. Then he went up in front of the class and gave us a speech. He told us our class was the mangiest, or ornery and wild. * * * He [plaintiff] was not standing up at any time during this and was almost on the floor with us. * * * He was also scared."

Plaintiff's testimony is in part: "We were fooling around like we always do at the first of the class and I picked up his [Jerry's] gloves and put them on. Mr. Kole asked for order and saw I had the gloves on. I started to take them off, finger by finger, and he told me to hurry and get them off. I think he thought I laughed at him, but I didn't. He came back, I took the gloves off, and threw them on Jerry's books. He came back and started hitting me. Then stopped and said, 'Are you going to do that again?' and I said, 'No.' He started hitting me again and then stopped and went to the front of the room and gave a talk. He hit me back and forth on both sides of the face. I did not at any time talk back to him. * * * I could hear other voices in the room talking, as there is always talking at the first of the class. * * * At the time he struck me, I was sitting down and did not stand up at any time. I was scared."

Part of plaintiff's cross-examination: "Jerry came in before the bell rang and laid his gloves on his books. I took the gloves before the bell rang and put them on. I don't believe I waved them in the air. * * * When he told me to take the gloves off, I started taking them off. When I got them off, I put them on Jerry's books."

At least two students besides plaintiff and Jerry testify defendant continued to strike plaintiff after he assured the

teacher he would "not do that again." Several say they did not hear plaintiff say anything else to defendant. There is much testimony the class was not completely "under way" at the time of the occurrence. Several of the 21 students in the class—all but one were witnesses—say they were talking or "fooling around." One witness testifies "the noise sounded like it was coming from all over." Another says "some of the kids were talking, just all over." Still another states "almost everybody was talking." One boy says he was "engaged in horseplay" at the time.

Two students testify they saw defendant was getting mad—one says he was getting madder—before he went back to plaintiff's desk to punish him.

In connection with the evidence plaintiff was slow in removing the gloves when ordered to do so, the undisputed testimony of two boys may be considered. Jerry Geisler says, "The gloves seemed to fit kind of tight. You had to pull them off finger by finger, but Mike did it kind of slow." Another member of the band testifies, "They were the type gloves that took a little too much time to get off and Mr. Kole told him twice, then came back and started hitting him. * * * I observed Mr. Kole hit Michael several times across the face with his hand."

Defendant had not reprimanded plaintiff before this particular time and his parents had never received any reports of his being unruly at school or elsewhere.

When plaintiff returned to his farm home from school about 4 p.m. he told his parents of the incident in class. The father saw the boy still had red marks of a hand print on his face. Plaintiff complained of a funny sensation in his left ear and along the side of his face, later that the ear hurt him. During the night his nose bled freely for some time. Neither parent knew of any previous trouble with either of plaintiff's ears. The next day the boy still had the funny feeling in his ear. After school he met his mother at the office of Dr. John D. Conner, the family physician.

The doctor found the boy's ear contained quite a little fresh blood. Some of the fluid the doctor used to clean the ear went down into his throat "and that, of course, indicated the eardrum had been ruptured." Two or three days later Doctor Conner

again examined the ear and again saw the rupture in the drum between the ear canal and middle ear. In September 1959 (about a year after plaintiff was punished), Doctor Conner again examined him and found there was still a perforation in the eardrum about the size of lead in a pencil.

Doctor Conner, the only medical witness, testifies "the probable chances of the opening closing after this length of time in my estimation are rather small." Also, "The effect of a perforation of the eardrum is that it reduces hearing. A person with a perforated eardrum is more susceptible to infection from a common cold or * * * swimming."

II. At the close of plaintiff's evidence defendant moved for a directed verdict on four grounds. Two of them allege failure to prove freedom from contributory negligence. (Plaintiff was 13 at the time.) A third ground asserts, in effect, the punishment was proper under the circumstances. The remaining ground states it would be the court's duty to set aside a verdict for plaintiff.

The trial court then announced, "This court has about concluded this is not a case which should be submitted to a jury. That we should stop this foolishness right here and now. This teacher had the right to discipline the student and to use such force as was necessary to do so."

In explaining its ruling to the jury the court expressed the opinion "Plaintiff must show the punishment was so cruel and unusual as to be beyond reason. I don't propose to let this case go any further. I think it is time * * * these kids must be taught some means of discipline. * * * For a period of time we sort of said don't spank the little dears, you might spoil their ego. Even parents weren't supposed to do anything to their kids because you would spoil their personality. * * *

"We first must determine whether the punishment was reasonable regardless of the consequences. * * * I don't believe it was unreasonable, any more than it would be for a parent to do something of this kind if his child disobeyed him or didn't do as he was told. If we had a situation where parents chain their kids to a bed and leave them there for days because they run off; that is unusual, unreasonable punishment. Where a

father burned his kid's fingers with a cigarette because he was getting things off the table; that would be unreasonable and cruel punishment. But it was the natural thing for this teacher to do where this boy had been causing trouble, and his attitude toward the teacher, disturbing the room, to slap him back and forth on the face."

III. There is no substantial dispute in the law that controls this appeal. It is sufficiently stated in the annotation to Suits v. Glover, 260 Ala. 449, 71 So.2d 49, 43 A. L. R.2d 465, commencing at 469, from which we quote: "* * * a teacher is immune from liability for physical punishment, reasonable in degree, administered to a pupil. * * *

"But a teacher's right to use physical punishment is a limited one. His immunity from liability in damages requires that the evidence show that the punishment administered was reasonable, and such a showing requires consideration of the nature of the punishment itself, the nature of the pupil's misconduct which gave rise to the punishment, the age and physical condition of the pupil, and the teacher's motive in inflicting the punishment. If consideration of all of these factors indicates that the teacher violated none of the standards implicit in each of them, then he will be held free of liability; but it seems liability will result from proof that the teacher, in administering the punishment, violated any one of such standards." (Pages 471, 472)

This vital statement appears on page 476 of the annotation: "The very nature of the rule which accords to a teacher the privilege to physically punish a pupil makes it clear that where it is sought to hold a teacher liable in damages for such punishment administered to a pupil, the crucial question is the reasonableness of the punishment.

*"The courts are in harmony in holding that whether particular punishment administered was, under the facts and circumstances, reasonable, is a question of fact to be determined by the jury."* (Citations) (Emphasis added.) Again, at page 485 of the annotation, we are told, "the basic question in cases of this kind (the question of reasonableness) is one of fact."

An earlier note in 65 L. R. A. 890, 898, cited by both sides, states: "It is always a question of fact, for the jury to deter-

mine from all the attending circumstances, whether a punishment inflicted was reasonable and proper, or excessive." This statement is also made in 24 R. C. L., Schools, section 100, page 642, which says too "* * * the test for determining whether the punishment inflicted was excessive is the general judgment of reasonable men." To like effect is 4 Am. Jur., Assault and Battery, section 59, page 158.

47 Am. Jur., Schools, section 175, page 428, states: "While teachers are clothed with a discretionary authority with respect to the infliction of corporal punishment on their pupils, the punishment must be reasonable and confined within the bounds of moderation; that is, it must not be cruel or excessive, and the teacher must not act wantonly or from malice or passion. * * * no precise rule can be laid down as to what is excessive or unreasonable punishment. Each case must depend on its own circumstances."

We shall not refer at length to the many decisions which support the above statements although we have carefully read them all. Defendant cites three Connecticut cases. The earliest, Sheehan v. Sturges, 53 Conn. 481, 482, 484, 2 A. 841, 842, says: "The extent and reasonableness of the punishment administered by a teacher to his pupil is purely a question of fact. This is too well settled to make the citation of authorities necessary. * * * Of course the teacher, in inflicting such punishment, must not exceed the bounds of moderation." To like effect are Calway v. Williamson, 130 Conn. 575, 36 A.2d 377, 378 (cited by both sides), and Andreozzi v. Rubano, 145 Conn. 280, 141 A.2d 639, 641.

Melen v. McLaughlin, 107 Vt. 111, 117, 176 A. 297, 299, also cited by defendant, affirms a judgment for plaintiff in a case of this kind, partly on the ground "the jury could have found that the blow that injured the plaintiff was struck in anger rather than as punishment." The opinion (page 116) contains this, "Among reasonable persons much difference prevails as to the circumstances which will justify the infliction of punishment, and the extent to which it may properly be administered."

We are not called upon to decide whether the question of

reasonableness of particular punishment would be for the jury in every conceivable case. Our problem is whether under the facts and circumstances here a jury question on such reasonableness is presented. And, as we indicated at the outset, this depends upon whether reasonable minds might fairly so conclude. It is significant that able, industrious counsel for defendant cite no decision of any court which holds a jury question on reasonableness of punishment in a case of this kind was not presented. Nor have we found such a precedent. In all to which our attention has been called the question of reasonableness was treated as one of fact for the jury, not—as was done here—as one of law for the court.

■ Perhaps the most important factor in determining whether corporal punishment a teacher administers to a pupil is privileged is "the form which the punishment took, including both the means by which [it] was inflicted *and the extent of resulting injury to the pupil.*" (Emphasis added.) Annotation, 43 A. L. R.2d 469, 478, citing decisions from nine states expressly or impliedly in support. It may be noted the trial court's view was that the reasonableness of the punishment must be determined "regardless of the consequences."

The nature of the pupil's conduct which gave rise to the punishment is also to be considered in ascertaining whether the teacher has overstepped the bounds of his privilege. Idem at page 479, citing precedents in support from twelve states.

The teacher's motive in administering the discipline must be considered. Idem at page 483, citing cases in support from eleven states. One of the citations is Cooper v. McJunkin, 4 Ind. 290, which holds that if the punishment is administered "in anger, or in any other respect immoderately or improperly," the perpetrator may be held for assault and battery. See also what is said supra re Melen v. McLaughlin, 107 Vt. 111, 176 A. 297, 299.

Suits v. Glover, supra, 260 Ala. 449, 450, 71 So.2d 49, 50, 43 A. L. R.2d 465, 468, in upholding *a jury verdict* for defendant-teacher as not against the weight of the evidence, observes "There was evidence warranting the inference that the appellee was in no wise angry or aggravated with the appellant when he ad-

ministered the spanking." Here, as previously stated, there is testimony—undisputed too—defendant was "mad and getting madder" when the punishment was inflicted. It is apparent punishment administered in anger is likely to be intemperate.

Restatement, Torts, sections 147 to 155, deals with the law governing cases of this kind. The rules there set out do not differ substantially from those heretofore stated. Section 148 says a teacher is not privileged to apply any force which is unreasonable "either, (a) as being disproportionate to the offense for which the child is being punished, or (b) as not being reasonably necessary and appropriate to compel obedience to a proper command." Section 149 provides a teacher "is not privileged to inflict upon a child a punishment which is * * * liable to cause serious or permanent harm." The comment under section 149 is: "The privilege to punish a child is given for the benefit of the child and for the purpose of securing his proper education and training. A punishment which does serious or permanent harm to the child * * * is obviously detrimental and not beneficial to his future."

Reference should probably be made to State v. Mizner, 45 Iowa 248, 24 Am. Rep. 769, and, upon the second appeal, 50 Iowa 145, 32 Am. Rep. 128. It is the only Iowa case which sheds any light upon the present appeal. It was a criminal prosecution against a teacher for assault and battery on a pupil. It holds the trial court "should have permitted the defendant to prove that the whipping was a reasonable chastisement of the prosecuting witness, as his pupil, for misconduct in school, and should have left it to the jury to determine whether or not the whipping was, under all the circumstances, reasonable" (page 252 of 45 Iowa). The precedent furnishes some support for our holding the reasonableness of the punishment here should also have been left to the jury.

IV. The jury could find the principal misconduct which gave rise to the punishment of plaintiff was his lack of speed in removing the gloves. The command defendant gave plaintiff was "to get those gloves off" and to hurry in doing so. That the gloves fit "kind of tight" and "you had to pull them off finger by finger" might be found to furnish some justification

for the delay in removing them. A circumstance to be considered is that the misconduct occurred at a time when "almost everyone was talking", some of the other pupils were "fooling around" and at least one was "engaged in horseplay." Under all the circumstances reasonable minds might fairly conclude plaintiff's misconduct was not extreme.

There is substantial evidence which stands undisputed that defendant struck plaintiff several times on both sides of his head and this was done in anger. The finding is warranted the boy's eardrum was ruptured and the injury is permanent. Reasonable minds might find injury was liable to result from the manner in which the punishment was inflicted. At least four witnesses testify defendant continued to strike plaintiff after he was scared and had given assurance "he would not do that again." It could fairly be found this added punishment was unnecessary and uncalled for.

It has been said, "The fact that a child appears unsubdued does not in itself justify a continuance of the punishment; * * *." 79 C. J. S., Schools and School Districts, section 502, page 448.

In Division II we have referred to the trial court's views of the case. They indicate he took it upon himself to decide what the authorities agree is a fact question for the jury—the reasonableness of the punishment under the circumstances. It is a question, as we have pointed out, on which much difference prevails among reasonable persons. Also, it has frequently been said, the test for determining whether the punishment was excessive is the general judgment of reasonable men.

■ Certainly there is room for disagreement among fair-minded persons with the trial court's characterization of the case as foolishness. No authority has come to our attention which supports the court's view "Plaintiff must show the punishment was so cruel and unusual as to be beyond reason." This puts a burden upon plaintiff he was not required to meet. It was his burden to prove the punishment was unreasonable under the circumstances.

Fair-minded persons might also conclude that punishment is unreasonable even though much less cruel than chaining a

child to a bed and leaving him there for days or deliberately burning his fingers—the two examples of unreasonable punishment given by the court. It would seem there is no fair room for disagreement that such punishment is unreasonable.

We can readily agree that proper discipline of children is of vital importance and disciplinary lapses seem to be widespread, with regrettable consequences. But, we repeat, the reasonableness of the punishment here was a question of fact for the jury, not one of law for the court.—Reversed and remanded.

All JUSTICES concur.