Eric NELSON, by his next friend, Corine Nelson, and Daniel R. Roberts, by his next friend, Robert Brown, on behalf of themselves and a class of persons similarly situated but too numerous and too transitory to mention, Plaintiffs-Appellees,

v.

Robert P. HEYNE, Individually and in his capacity as Commissioner of Corrections, Indiana Department of Corrections, et al., Defendants-Appellants.

Nos. 72–1970, 73–1446.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1973.

Decided Jan. 31, 1974.

353

Theodore Sendak, Atty. Gen., Darrel K. Diamond, Deputy Atty. Gen., Indianapolis, Ind., for defendants-appellants.

Thomas A. Digrazia and John P. Forhan, South Bend, Ind., for plaintiffs-appellees.

Before KILEY, Senior Circuit Judge, and FAIRCHILD and SPRECHER, Circuit Judges.

KILEY, Senior Circuit Judge.

The district court in this class civil rights action [1] enjoined defendants from implementing alleged unconstitutional practices and policies in conducting the Indiana Boys School under their administration; and declared the practices and policies unconstitutional. In Appeal No. 72–1970 defendants challenge the validity of the judgment granting the injunction, and in Appeal No. 73–1446 challenge the declaratory judgment. We affirm.

The School, located in Plainfield, Indiana, is a medium security state correctional institution for boys twelve to eighteen years of age, an estimated one-third of whom are non-criminal offend-

1. 42 U.S.C. § 1983.

ers. The boys reside in about sixteen cottages. The School also has academic and vocational school buildings, a gymnasium and an administrative building. The average length of a juvenile's stay at the School is about six and one-half months. Although the School's maximum capacity is less than 300 juveniles, its population is generally maintained at 400. The counselling staff of twenty individuals includes three psychologists with undergraduate academic degrees, and one part-time psychiatrist who spends four hours a week at the institution. The medical staff includes one part-time physician, one registered nurse, and one licensed practical nurse.

The complaint alleged that defendants' practices and policies violated the 8th and 14th Amendments rights of the juveniles under their care. Plaintiffs moved for a temporary restraining order to protect them from, inter alia, defendants' corporal punishment and use of control-tranquilizing drugs. After hearing, the district court denied the motion and set the date for hearing on the merits. Defendants' answer generally denied plaintiffs' allegations. Trial briefs were filed upon the issue whether defendants deprived plaintiffs of their alleged right to adequate rehabilitative treatment.

The court found that it had jurisdiction and that the corporal punishment and the method of administering tranquilizing drugs by defendants constituted cruel and unusual punishment in violation of plaintiffs' 8th and 14th Amendment rights. The judgment restraining the challenged practices followed. The court thereafter, in a separate judgment, declared plaintiffs had the right to adequate rehabilitative treatment.[2]

## I—CRUEL AND UNUSUAL PUNISHMENT

### A.

It is not disputed that the juveniles who were returned from escapes or who were accused of assaults on other students or staff members were beaten routinely by guards under defendants' supervision. There is no proof of formal procedures that governed the beatings which were administered after decision by two or more staff members. Two staff members were required to observe the beatings.

In beating the juveniles, a "fraternity paddle" between ½″ and 2″ thick, 12″ long, with a narrow handle, was used. There is testimony that juveniles weighing about 160 pounds were struck five blows on the clothed buttocks, often by a staff member weighing 285 pounds. The beatings caused painful injuries.[3] The district court found that this disciplinary practice violated the plaintiffs' 8th and 14th Amendment rights, and ordered it stopped immediately.

We recognize that the School is a correctional, as well as an academic, institution.[4] No case precisely in point

---

2. Nelson v. Heyne, 355 F.Supp. 451 (N.D. Ind.1972). The district court's decision was entered as if a declaratory judgment on the right to treatment. We treat that portion of the decision, however, as an otherwise nonappealable interlocutory order and grant review pursuant to 28 U.S.C. § 1292(b). Formal certification by a district judge is not always required in a marginally final case. See Gillespie v. U. S. Steel Corp., 379 U.S. 148, 154, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964); 9 Moore's Federal Practice, ¶ 110.12 and ¶ 110.22(3).

3. The trial record indicates that one juvenile was struck with such force that it caused him to sleep on his face for three days, with black, blue and numb buttocks. One juvenile

testified that he bled after receiving five blows on his buttocks. Another, Daniel Roberts, testified that once he pleaded, to no avail, with staff personnel not to be beaten until after certain blisters on his buttocks ceased to cause him pain.

4. (a) The law appears to be well settled in both state and federal jurisdictions that school officials do not violate 8th Amendment proscriptions against cruel and unusual punishment where the punishment is reasonable and moderate. Ware v. Estes, 328 F. Supp. 657 (N.D.Tex.1971); Sims v. Board of Education, 329 F.Supp. 678 (D.C.N.M. 1971); Tinkham v. Kole, 252 Iowa 1303, 110 N.W.2d 258 (1961); Carr v. Wright (Ky.)

has been cited or found which decided whether supervised beatings in a juvenile reformatory violated the "cruel and unusual" clause of the 8th Amendment.[5] However, the test of "cruel and unusual" punishment has been outlined. In his concurring opinion in Furman v. Georgia, 408 U.S. 238, 279, 92 S.Ct. 2726, 2747, 33 L.Ed.2d 346 (1971), Justice Brennan stated that:

The final principle inherent in the [Cruel and Unusual Punishment] Clause is that a severe punishment must not be excessive. A punishment is excessive under this principle if it is unnecessary: The infliction of a severe punishment by the State cannot comport with human dignity when it is nothing more than the pointless infliction of suffering. If there is a significantly less severe punishment adequate to achieve the purposes for which the punishment is inflicted, the punishment inflicted is unnecessary and therefore excessive. (Citations omitted.)

Expert evidence adduced at the trial unanimously condemned the beatings. The uncontradicted authoritative evidence indicates that the practice does not serve as useful punishment or as treatment, and it actually breeds counter-hostility resulting in greater aggression by a child. For these reasons we find the beatings presently administered are unnecessary and therefore excessive. We think, under the test of *Furman,* that the district court did not err in deciding that the disciplinary beatings shown by this record constituted cruel and unusual punishment.[6]

The 8th Amendment prohibition against cruel and unusual punishment is binding on the states through the 14th Amendment. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947). The meaning of cruel and unusual punishment in law has varied through the course of history, and as the Court observed in Trop v. Dulles, 356

423 S.W.2d 521 (1968); Houeye v. St. Helen Parish School Board, 223 La. 966, 67 So.2d 553 (1953). In *Ware* there was evidence of beatings usually administered by hitting the student on his buttocks with a paddle. The paddle was wooden, 2' long, 1/4" to 1/2" thick, 6" wide, used under a written rule which proscribed corporal punishment without parents' permission. The district court found that "some of the seven thousand" teachers in the public school district abused the policy, but that that fact, and nothing more, would not make the policy itself unconstitutional. In *Sims*, the court found that beatings by school officials did not constitute cruel and unusual punishment where the plaintiff student received three blows with a paddle on the buttocks and experienced slight physical harm. In our case, there is ample evidence that the beatings caused severe injury. *See generally* 68 Am. Jur.2d Schools § 258 (1973).

(b) The courts in recent years have frowned upon the use of corporal punishment in penal and correctional institutions. *See generally* 60 Am.Jur.2d Penal and Correctional Institutions § 43 (1972). Corporal punishment has not been used for years in federal prisons. Jackson v. Bishop, 404 F.2d 571, 575 (8th Cir. 1968). Courts have enjoined prison personnel from inflicting corporal punishment including the use of a strap for whipping. Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark.1965); Jackson v. Bishop, *supra*. In *Talley* the court did not hold prison whippings are per se unconstitutional, but stated that they will be enjoined if excessive, and not applied under recognizable standards. In *Jackson* the 8th Circuit held that use of a strap in Arkansas penitentiaries was cruel and unusual punishment. *See generally,* Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970); Comment, Cruel and Unusual Punishment-Arkansas Penitentiary Violates the Eighth Amendment, 84 Harv.L. Rev. 456 (1970); M. Wheeler, Toward a Theory of Limited Punishment, 24 Stan.L. Rev. 838 (1972).

5. The court in Lollis v. New York, 322 F. Supp. 473 (S.D.N.Y.1970), involving the constitutionality of solitary confinement in juvenile institutions, obliquely considered the binding and handcuffing of an inmate. Inmates of Boys' Training School v. Affleck, 346 F.Supp. 1354 (D.C.R.I.1972), also concerned the question of whether isolation of juvenile inmates constitutes cruel and unusual punishment.

6. We do not hold that all corporal punishment in juvenile institutions or reformatories is per se cruel and unusual.

U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958):

> The [8th Amendment] must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

The district court's decision meets tests that have been applied in decisions to determine whether the standards of decency in a maturing society have been met, *i. e.*: whether the punishment is disproportionate to the offense, Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); and whether the severity or harshness of the punishment offends "broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968). The record before us discloses that the beatings employed by defendants are disproportionate to the offenses for which they are used, and do not measure up to contemporary standards of decency in our contemporary society.

There is nothing in the record to show that a less severe punishment would not have accomplished the disciplinary aim. And it is likely that the beatings have aroused animosity toward the School and substantially frustrated its rehabilitative purpose. We find in the record before us, to support our holding, general considerations similar to those the court in *Jackson* found relevant: (1) corporal punishment is easily subject to abuse in the hands of the sadistic and unscrupulous, and control of the punishment is inadequate; (2) formalized School procedures governing the infliction of the corporal punishment are at a minimum;

(3) the infliction of such severe punishment frustrates correctional and rehabilitative goals; and (4) the current sociological trend is toward the elimination of all corporal punishment in all correctional institutions.

The Indiana Supreme Court decision in Indiana State Personnel Board v. Jackson, 244 Ind. 321, 192 N.E.2d 740 (1963), cited by the defendants, is of no aid to set aside the district court decision. There the court held, inter alia, under the *parens patriae* doctrine, that a public school teacher, in proper cases and proportions, may administer corporal punishment.[7] We agree with that decision.

### B.

Witnesses for both the School and the juveniles testified at trial that tranquilizing drugs, specifically Sparine and Thorazine, were occasionally administered to the juveniles, not as part of an ongoing psychotherapeutic program, but for the purpose of controlling excited behavior.[8] The registered nurse and licensed practical nurse prescribed intramuscular dosages of the drugs upon recommendation of the custodial staff under standing orders by the physician.[9] Neither before nor after injections were the juveniles examined by medically competent staff members to determine their tolerances.

The district court also found this practice to be cruel and unusual punishment. Accordingly the court ordered the practice stopped immediately, and further ordered that no drug could be administered intramuscularly unless spe-

7. There the dismissed teacher disciplined a fourteen year old girl in the classroom and in his office by striking her, in the presence of witnesses, very lightly and without anger, across the buttocks with a belt, and only after persuasion and other means had been tried and had failed.

8. Plaintiff Steven Hegg testified that on one occasion while he was recuperating from a blow to the nose inflicted upon him by another student, his nose began to bleed profusely and he began to vomit and "holler for help." The nurse told him there was noth-

ing seriously wrong with him; but when Steven continued to request help, she became infuriated and injected him with a tranquilizing drug. Eric Nelson testified to the effect that he was given shots of tranquilizing drugs on several occasions for the purpose of preventing him from running away from the School.

9. The standing order provided that an emotionally upset boy under 116 pounds be given a half cc or 25 milligrams of Sparine. Above that weight he was to be given one cc or 50 milligrams of Sparine.

cifically authorized or directed by a physician in each case, and unless oral medication was first tried, except where the staff was directed otherwise by a physician in each case.

■ We agree with defendants that a judge lacking expertise in medicine should be cautious when considering what are "minimal medical standards" in particular situations. However, practices and policies in the field of medicine, among other professional fields, are within judicial competence when measured against requirements of the Constitution. We find no error in the competent district court's determination here that the use of tranquilizing drugs as practiced by defendants was cruel and unusual punishment.

■ We are not persuaded by defendants' argument that the use of tranquilizing drugs is not "punishment." Experts testified that the tranquilizing drugs administered to the juveniles can cause: the collapse of the cardiovascular system, the closing of a patient's throat with consequent asphyxiation, a depressant effect on the production of bone marrow, jaundice from an affected liver, and drowsiness, hemotological disorders, sore throat and ocular changes.[10]

■ The interest of the juveniles, the School, and the state must be considered in determining the validity of the use of the School's tranquilizing drugs policy. The interest of the state appears to be identical more or less with the interest of the maladjusted juveniles committed to the School's care, i. e., reformation so that upon release from their confinement juveniles may enter free society as well adjusted members. The School's interest is in the attainment and maintenance of reasonable order so that the state's purpose may be pursued in a suitable environment. The School's interest, however, does not justify exposing its juveniles to the potential dangers noted above. Nor can Indiana's interest in reforming its delinquent or maladjusted juveniles be so compelling that it can use "cruel and unusual" means to accomplish its benevolent end of reformation.

We hold today only that the use of disciplinary beatings and tranquilizing drugs in the circumstances shown by this record violates plaintiffs' 14th Amendment right protecting them from cruel and unusual punishment. We do not intend that penal and reform institutional physicians cannot prescribe necessary tranquilizing drugs in appropriate cases. Our concern is with actual and potential abuses under policies where juveniles are beaten with an instrument causing serious injuries, and drugs are administered to juveniles intramuscularly by staff, without trying medication short of drugs and without adequate medical guidance and prescription.[11]

---

10. Dr. James W. Worth, psychologist with the Mental Health Center of St. Joseph County, Indiana, also testified as follows:

I think the use of major tranquilizing drugs without intelligent and informed medical observation have no place . . . in the institution. These are serious drugs. They have serious effect on the individual. . . . [I]f this is not done with a full medical understanding of this individual with a physician present, harm could occur and furthermore, I think it tends to be degrading to an individual.

11. Experts testified that the following minimum medical safeguards should be followed in the use of tranquilizing drugs:

(1) The individual administered the drug should be observed, during the duration of the drug's effect, by trained medical personnel, familiar with the possible adverse and harmful side effects of the drug used.

(2) The person receiving an IM (intramuscular) injection of a major tranquilizing drug should first receive a diagnosis or prescription authorizing the use of said drug by a qualified medical doctor, child psychiatrist, psychologist or physician.

(3) IM injections should only be administered by a physician or intern and only after all attempts have failed to get the individual to take the drug orally.

(4) Major tranquilizing drugs, such as Thorazine and Sparine, should not be administered IM, unless given in a hospital where there is an intensive care unit and emergency

## II—THE RIGHT TO REHABILITATIVE TREATMENT

The School staff-to-juvenile ratio for purposes of treatment is approximately one to thirty. The sixteen counselors are responsible for developing and implementing individualized treatment programs at the institution, but the counselors need have no specialized training or experience. Administrative tasks ("paper work") occupy more than half of the counselors' time. The duties of the staff psychiatrist are limited to crises. He has no opportunity to develop and manage individual psychotherapy programs. The three staff psychologists do not hold graduate degrees and are not certified by Indiana. They render, principally, diagnostic services, mostly directed toward supervising in-take behavior classifications.

In June, 1971, the School adopted what was described as a differential treatment program, bottomed mainly on the Quay Classification .System. Under the Quay System, upon their admission to the School, juveniles are classified with respect to four personality and behavior types on the basis of standardized tests: the inadequate, the neurotic, the aggressive, and the sub-cultural. Each of the sixteen cottages at the School houses twenty to thirty juveniles, with common personality and behavior patterns. Each cottage is served by a staff comprising a house manager, a counselor, an educator, and a consulting psychologist. The cottage staff meets weekly for evaluation of the rehabilitation program of each inmate. Upon admission to a cottage, each juvenile agrees to improve his behavior in four areas of institutional life: "cottage," "recreation," "school," and "treatment." Correspondingly, each has responsibility for physical maintenance of the residen-

tial area, social and athletic activities, specified levels of academic or vocational skills, and improved personality goals. With success in each of the four areas, the juvenile earns additional privileges, ultimately culminating in a parole date.

 The district court decided that both Indiana law and the federal Constitution secure for juvenile offenders a "right to treatment," and that the School failed to provide minimal rehabilitative treatment. Defendants contend that there exists no right to treatment under the Constitution or Indiana law, and that if there is the right, the Quay Classification System used at the School did not violate the right. We hold, with the district court, that juveniles have a right to rehabilitative treatment.

The right to rehabilitative treatment for juvenile offenders has roots in the general social reform of the late nineteenth century, was nurtured by court decisions throughout the first half of this century, and has been established in state and federal courts in recent years. In re Gault, 387 U.S. 1, 15–16, 87 S.Ct. 1428, 1437, 18 L.Ed.2d 527 (1967), the Court stated:

The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals . . . . The child was to be "treated" and "rehabilitated" and the procedures, from apprehension through institutionalization, were to be "clinical" rather than punitive.

Since the beginning, state courts have emphasized the need for "treatment" in their Juvenile Court Acts. Wisconsin Industrial School for Girls v. Clark County, 103 Wis. 651, 79 N.W. 422, 427 (1899); Commonwealth v. Fisher, 213

facilities which could deal with possible adverse effects from the use of said drugs.

(5) Major tranquilizing drugs should only be used to control psychotic or pre-psychotic breakdowns or as a followup in assisting a schizophrenic patient from having a recurrence of a psychotic breakdown.

(6) Major tranquilizing drugs should not be used merely to induce sleep or unconsciousness for a period of time, but only as a part of a psychotherapeutic program of treatment.

Pa. 48, 62 A. 198, 199 (1905); Ex Parte Sharp, 15 Idaho 120, 96 P. 563, 564 (1908); Wissenberg v. Bradley, 209 Iowa 813, 229 N.W. 205, 207 (1929).

The United States Supreme Court has never definitively decided that a youth confined under the jurisdiction of a juvenile court has a constitutionally guaranteed right to treatment. But the Court has assumed, in passing on the validity of juvenile proceedings, that a state must provide treatment for juveniles. In Kent v. United States, 383 U. S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), the Court reversed the district court's conviction of a sixteen year old after the District of Columbia Juvenile Court had waived its jurisdiction. Justice Fortas there, writing for the Court, commented on the theory and practice of juvenile courts:

> There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children. 383 U. S. at 556, 86 S.Ct. at 1054.

Later, in In re Gault, *supra*, Justice Fortas "reiterate[d] the view" of *Kent* that the juvenile process need not meet the constitutional requirements of an adult criminal trial, but must provide essential "due process and fair treatment." This view has been continued subsequent to *Gault* in the Supreme Court decisions involving juvenile court procedures. In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).

It is true that the Supreme Court cases discussed above deal with procedural due process and not the right to rehabilitative treatment, but several recent state and federal cases, out of concern —based upon the *parens patriae* doctrine underlying the juvenile justice system—that rehabilitative treatment was not generally accorded in the juvenile reform process, have decided that juvenile inmates have a constitutional right

to that treatment. M. v. M., 71 Misc.2d 396, 336 N.Y.S.2d 304 (1972); Inmates of Boys' Training School v. Affleck, 346 F.Supp. 1354 (D.C.R.I.1972); Martarella v. Kelley, 349 F.Supp. 575 (S.D.N.Y. 1972).

In *Martarella* the court found a clear constitutional right to treatment for juveniles based on the 8th and 14th Amendments:

> What we have said, although the record would justify more, is sufficient to establish that, however benign the purposes for which members of the plaintiff class are held in custody, and whatever the sad necessities which prompt their detention, they are held in penal condition. Where the State, as parens patriae, imposes such detention, it can meet the Constitution's requirement of due process and prohibition of cruel and unusual punishment *if, and only if, it furnishes adequate treatment to the detainee.* 349 F.Supp. at 585. (Emphasis supplied, footnotes omitted.)

After an historical analysis of the development of the right, the court concluded:

> In sum, the law has developed to a point which justifies the assertion that: "A new concept of substantive due process is evolving in the therapeutic realm. This concept is founded upon a recognition of the concurrency between the state's exercise of sanctioning powers and its assumption of the duties of social responsibility. Its implication is that effective treatment must be the *quid pro quo* for society's right to exercise its *parens patriae* controls. Whether specifically recognized by statutory enactment or implicitly derived from the constitutional requirements of due process, the right to treatment exists." 349 F.Supp. at 600. (Footnotes omitted.)

In a most recent case, Morales v. Turman, 364 F.Supp. 166 (E.D.Tex.1973), a federal district court specifically found that juveniles at Texas' six juvenile training schools have both a statutory and constitutional right to treatment.

We hold that on the record before us the district court did not err in deciding that the plaintiff juveniles have the right under the 14th Amendment due process clause to rehabilitative treatment.[12]

## III—ADEQUACY OF TREATMENT

■ Experts testified at the trial, and the defendants admit, that the Quay System of behavior classification is not treatment. And case histories of maladjusted juveniles show that use of the System falls far short of its improved personality goals. Mrs. Betty Levine, resident instructor in sociology at the University of Indiana, testified that the School lacks the individual treatment given in the Indiana Girls School. The record shows very little individual treatment programmed, much less implemented, at the School; and it is unclear exactly how much time is spent in individual counselling. We conclude that the district court could properly infer that the Quay System as used in the School failed to provide adequate rehabilitative treatment.

We leave to the competent district court the decision: what is the minimal treatment required to provide constitutional due process, having in mind that the juvenile process has elements of both the criminal and mental health processes.[13]

■ In our view the "right to treatment" includes the right to minimum acceptable standards of care and treatment for juveniles and the right to *individualized* care and treatment. Because children differ in their need for rehabilitation, individual need for treatment will differ. When a state assumes the place of a juvenile's parents, it assumes as well the parental duties, and its treatment of its juveniles should, so far as can be reasonably required, be what proper parental care would provide. Without a program of individual treatment the result may be that the juveniles will not be rehabilitated, but warehoused, and that at the termination of detention they will likely be incapable of taking their proper places in free society; their interests and those of the state and the school thereby being defeated.

We therefore affirm the judgment of the district court in each appeal, and remand [14] only for the limited purpose of further proceedings in No. 73–1446 with respect to the right to rehabilitative treatment.

\* \* \* \* \*

. . . Finally, the arguments for the right to treatment in both processes rely heavily upon the medical services, especially psychiatry and psychology.
Note, A. Right to Treatment for Juveniles, 1973 Wash.U.L.Q. 157, 160.
*See also*, N. Kittrie, Can the Right to Treatment Remedy the Ills of the Juvenile Process? 57 Geo.L.J. 848, 860–861 (1969) ; Note, The Courts, the Constitution and Juvenile Institutional Reform, 52 B.U.L.Rev. 33, 42–49 (1972).

12. We note that the district court additionally determined that a right to treatment in this case has a statutory basis in view of the "custody, *care*, and discipline" language of the Indiana Juvenile Court Act, Burns Ind.Stat.Ann. § 9–3201, IC 1971, 31–5–7–1. (Emphasis supplied.) We agree with this conclusion. Since we have today determined that the federal Constitution affords juveniles a right to treatment, any interpretation of the Indiana Act which would find no such right to exist would itself be unconstitutional.

13. The juvenile justice process can be understood to be a hybrid between the criminal system and the mental health process.

14. See note 2, *supra*.