THE STATE OF NEW JERSEY IN THE INTEREST OF
D. F., A JUVENILE.

Superior Court of New Jersey
Appellate Division

Submitted November 29, 1976—Decided December 22, 1976.

Before Judges BISCHOFF, MORGAN and E. GAULKIN.

*Mr. William F. Hyland,* Attorney General of New Jersey, attorney for appellant, Division of Youth and Family Services (*Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Ms. Erminie L. Conley,* Deputy Attorney General, on the brief).

*Mr. Isaiah Steinberg,* attorney for respondent, D. F. (*Mr. Saul J. Steinberg* on the brief).

The opinion of the court was delivered by

MORGAN, J. A. D. The Division of Youth and Family Services of the New Jersey Department of Institutions and Agencies (DYFS) appeals from the final judgment of the Camden County Juvenile and Domestic Relations Court, reported at 138 *N. J. Super.* 383 (1975), placing a juvenile delinquent under the care of DYFS pursuant to *N. J. S. A.* 2A:4–61(e) and simultaneously ordering DYFS to place the juvenile in the Institute of Pennsylvania Hospital for psychiatric treatment so as to impose upon DYFS primary responsibility for the cost of his psychiatric care.

The issue presented arose during a hearing directed toward determining the appropriate disposition to be made

of the 15-year-old juvenile who, following a plea of guilty, had been adjudicated delinquent for 17 acts of larceny. The trial judge's findings of fact, not challenged as evidentially unsupported, are recited in his opinion and will not be repeated here. The essence of these findings is that D. F. was suffering from a psychiatric disorder of considerable magnitude and was in need of care for that condition. Based upon these findings, and following consideration of testimony of doctors called by counsel for D. F. concerning the best facilities available to provide the needed treatment, the trial judge ordered, as a condition of probation, "that the juvenile D. F. be placed immediately in The Institute of Pennsylvania Hospital, with the financial costs to be borne by the Division. These costs may be supplemented by funds from any other source, but the primary financial obligation will remain with the State." *Id.* at 397. Pursuant to this order, D. F. was placed in the chosen facility at a cost of $110 a day or approximately $3,300 a month. As of the date the Division's brief was submitted to this court, costs in the amount of $17,000 had accrued for D. F.'s care at the Institute of Pennsylvania Hospital. The reasons given by the judge for the order were the found need of the juvenile for treatment in a structured psychiatric facility, the juvenile's right thereto stemming from the court's *parens patriae* obligation, and a juvenile's constitutional right to treatment adequate to his needs.

It should be emphasized that DYFS was never made a formal party to the proceedings before the Juvenile Court; rather it appeared in response to a request that it provide assistance in determining the court's choice among available dispositional alternatives. Hence, the issues raised here were never fully developed in an adversary proceeding and have only emerged with clarity on this appeal.

DYFS does not question the court's authority to place the juvenile in its care or, in the alternative, its authority to order his placement for treatment in a particular facility without the participation of DYFS. Rather, it urges that the

court is without authority to do both so as to impose upon DYFS the cost of treatment in a facility chosen by the court.[1] DYFS argues that to permit the court to do this would unduly hamper its ability to discharge its statutory duties and would seriously threaten its fiscal ability to function in a fair and equitable manner as to all of its juvenile charges.

The solution to the problem presented must be found in the legislation defining the scope of DYFS's responsibility and the jurisdiction of the Juvenile and Domestic Relations Court over juveniles coming before it for disposition. With respect to DYFS, that agency is the most recent creation of the Legislature designed to provide for the care of children who are neglected, abused or otherwise in need of nonparental supervision. *N. J. S. A.* 30:4C-1 *et seq.* In delegating this responsibility over such children the Legislature has invested DYFS with broad authority to determine the proper care and treatment of those juveniles coming within its jurisdiction. See *N. J. S. A.* 30:4C-3, 4. Broad supervisory control over the care, custody and guardianship of eligible children is provided for in *N. J. S. A.* 30:4C-11; authority with respect to maintenance and supervision of such children is granted in *N. J. S. A.* 30:4C-25. There is no question but that DYFS is authorized to place a child in an appropriate institution, even a private one, if it deems such care essential. See *N. J. S. A.* 30:4C-26; *N. J. S. A.* 30:4C-11; *N. J. S. A.* 30:4C-4(i).

Notwithstanding the breadth of DYFS's responsibility, its authority to act on behalf of the children coming under its care is limited by its available financial resources. Indeed, throughout the legislation pertaining to the authority and responsibility of DYFS runs the recurrent theme of fiscal responsibility. Only after attempts are made to refer a particular juvenile to other available sources of support should

---

[1]There is no question but that the form of disposition was specifically designed to gain access to DYFS's appropriated funds.

DYFS accept custody and provide care; even then, the obligation incurred on behalf of any juvenile must be made "within the limits of legislative appropriations, to provide for all children in similar circumstances." *N. J. S. A.* 30: 4C–13. DYFS represents that it presently has a responsibility for approximately 43,000 children, only a portion of whom are adjudicated delinquents or in need of supervision; each has to be cared for according to his or her needs. Since the resources available by appropriation are necessarily finite, that which is expended for the care of one child is unavailable to others who also may have needs as imperative. Hence, the mandate to provide care within limits of the resources available to all children in similar circumstances. By centralizing responsibility in DYFS for allocating available resources to meet the needs of children in its charge, the Legislature has provided the means by which need and financial wherewithal can be balanced and a reasonably equitable allocation of appropriated funds achieved.

Placement of an adjudicated delinquent in the care of DYFS triggers that agency's responsibility to provide care and services for that child beyond that of merely providing the financing for such services. See *N. J. S. A.* 30: 4C–3, 4. *N. J. S. A.* 30:4C–1 *et seq.,* the statutory enactment creating DYFS, did not constitute that agency a bank upon which the Juvenile and Domestic Relations Courts may draw to finance dispositions of juveniles coming before them. See *Crist v. New Jersey Div. Youth and Family Servs.,* 135 *N. J. Super.* 573 (App. Div. 1975). Rather DYFS is the state agency invested by statute with broad discretion in the care and supervision of juveniles placed in its custody, which it must be permitted to exercise in the first instance and which, as in the case of all other agency actions, will be subject to review for a mistaken exercise thereof. It must act not only with respect to the needs of the particular juvenile concerned but also in light of the needs of the thousands of other juveniles equally needy and as limited by

available resources. It cannot perform this function if its budget is to be affected by the orders of some 30 Juvenile and Domestic Relations Court judges issued without respect to the realities of its fiscal problems. Since the Juvenile Court gave no apparent consideration to the cost of the treatment it was ordering to be paid for by DYFS, and since DYFS must, by statute, act within its allotted budget, the result of authorizing the challenged order would be to favor those juveniles whose past conduct has brought them before a juvenile judge, to the prejudice of the majority of DYFS's children who, having committed no anti-social acts, would apparently have a lesser claim to the State's generosity. The essential unfairness of this result, as well as the practical impossibility of achieving a fair method of allocating the agency's limited resources among all of its charges, provides perhaps the best reason why the order must fall.

Moreover, the dispositional alternatives following an adjudication of delinquency made available to a Juvenile and Domestic Relations Court are specifically set forth in *N. J. S. A.* 2A:4–61, giving content to the court's *parens patriae* function. They are:

a. Adjourn formal entry of disposition of the case for a period not to exceed 12 months for the purpose of determining whether the juvenile makes a satisfactory adjustment, and if during the period of continuance the juvenile makes such an adjustment, dismiss the complaint; or

b. Release the juvenile to the supervision of his or her parent or guardian; or

c. *Place the juvenile on probation to the chief probation officer of the county or to any other suitable person who agrees to accept the duty of probation supervision for a period not to exceed 3 years upon such written conditions as the court deems will aid rehabilitation of the juvenile;* or

d. Transfer custody of the juvenile to any relative or other person determined by the probation department to be qualified to care for the juvenile; or

e. *Place the juvenile under the care of the Division of Youth and Family Services pursuant to P. L. 1951, c. 138, s.2(c) (C.30:4C-2(c)).*

f. Place the juvenile under the care and custody of the Commissioner of the Department of Institutions and Agencies for the pur-

pose of receiving the services of the Division of Mental Retardation of that department, provided that the juvenile has been determined to be eligible for those services under P. L. 1965, c. 59, s.16 (C.30:4-25.4); or

g. *Commit the juvenile to a suitable institution for the treatment of mental illness if after hearing it is determined from psychiatric evidence that the juvenile does or may constitute a danger to himself or to other persons if not so committed;* or

h. Commit the juvenile to a suitable institution maintained for the rehabilitation of delinquents for an indeterminate term not to exceed 3 years; except, that, any time an adjudication of juvenile delinquency is predicated upon an offense which, if committed by a person of the age of 18 years or over would constitute any form of homicide as defined in N. J. S. A. 2A:113-1, 2A:113-2, 2A:113-4 or 2A:113-5 then the period of confinement shall be indeterminate and shall continue until the appropriate paroling authority determines that such person should be paroled; and, except that in any case the period of confinement and parole shall not exceed the maximum provided by law for such offense if committed by a person of the age of 18 years or over.

Any juvenile committed under this act who is released on parole prior to the expiration of his maximum term may be retained under parole supervision for a period not exceeding the unserved portion of the term.

i. Such other disposition not inconsistent with this act as the court may determine.

■ Clearly, the underlined provisions, (c), (e) and (g), are the ones pertinent to the present matter. The Juvenile Court is empowered to commit the juvenile to the care of DYFS *or* to place the juvenile in a "suitable" institution for the treatment of mental illness if the juvenile is found to be a danger to himself or others *or* to place him on probation subject to specific conditions.[2] There exists, however, no specific statutory authority permitting the hybrid disposition ordered in the present case when the Juvenile Court committed D.F. to DYFS, invoking that agency's responsibility for D.F.'s care while, at the same time, foreclosing

---

[2]Alternative (g) authorizing commitment to a mental hospital was not the basis of the disposition. The trial judge made no finding that the juvenile was a danger to himself or others.

exercise of agency discretion by itself dictating a required disposition.

We see nothing invalid in requiring the juvenile to submit himself to psychiatric care, either resident or outpatient, as a condition to probation where, as in this case, such care appears necessary for his well-being and in the best interest of those around him. Such disposition is made available in *N. J. S. A.* 2A:4–61(c) permitting the Juvenile Court judge to specify conditions to probation. He can even require that DYFS choose the appropriate institution. Attendance at a residential psychiatric facility in those circumstances will not, however, be at the cost of the State unless the facility chosen be a public one or unless DYFS, if requested, selects a private institution which, in light of its fiscal realities, can be met out of its budget.

The financial considerations associated with this commitment must be confronted. The Institute of Pennsylvania Hospital, one of the most outstanding mental facilities in the country, is expensive. $40,000 for one year of treatment puts the facility well beyond the financial capability of all but the most wealthy. Undoubtedly, a substantial number of the 43,000 children under the supervision of DYFS would derive benefit from the Institute's facilities. All of these needy juveniles cannot be treated at the Institute or at comparable facilities, simply because money for that level of care has not been made available. Clearly, the best possible treatment for a mentally ill juvenile is a worthy goal; although mere money, ideally speaking, should not be a consideration, the inescapable fact remains that it is, whether the money be the public's or the parents'. DYFS's appropriated funds must be apportioned among its juvenile charges according to some equitable and ordered scheme of allocation. Most parents simply cannot afford such level of institutional care for their children. Hence, we conclude that requiring a juvenile to attend as expensive a facility as the Institute of Pennsylvania Hospital as a condition of probation, under *N. J. S. A.* 2A:4–61(c), would have been as unreasonable as

was the requirement that such confinement be paid for by DYFS, and equally beyond the proper bounds of the court's discretion.

A final comment is required with respect to that portion of the trial judge's opinion which declared a juvenile's constitutional right to treatment for mental disorder as one basis for the commitment in question. First, whether or not such a constitutional right exists, it will not include, at least in the near future, the right to publicly financed treatment in one of the most costly facilities available on a national basis. No case cited by the trial judge so holds, and we have been unable to find any other in support of that proposition. See, for example, *Nelson v. Heyne,* 491 *F.* 2d 352, 360 (7 Cir.), *cert.* den. 417 *U. S.* 976, 94 *S. Ct.* 3183, 41 *L. Ed.* 2d 1146 (1974), where it was held that the " 'right to treatment' includes the right to minimum acceptable standards of care." More important, the trial judge's discussion of this right was inappropriate in the context of this case and we therefore decline comment on his discourse on the subject. This is not a case in which the juvenile has been confined for treatment which was denied him by the institution in which he was confined. See *e. g. Rouse v. Cameron,* 125 *U. S. App. D. C.* 366, 373 *F.* 2d 451 (D. C. Cir. 1966) ; *Nelson v. Heyne, supra.* A juvenile, adjudicated delinquent or in need of supervision, has no constitutional right to treatment for a mental disorder without first being confined for purposes of treatment. The right, if any, and the extent thereof, is triggered by a confinement, not by the adjudication of delinquency. If that were not so, and if the present order were permitted to stand, then any juvenile needing psychiatric care beyond his parents' means need only commit an act of delinquency in order to obtain what he and his parents could not otherwise afford. (But see *N. J. S. A.* 2A:4–2 declaring the goal of securing for a child removed from his family "custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents.") It would confer on

delinquents substantial and costly rights not available to other juveniles who, although mentally ill and equally in need of treatment, have not conducted themselves so as to bring themselves before a juvenile court. Such inequitable allocation of public resources can have neither constitutional nor statutory support.

 We, therefore, conclude that the challenged order is infirm on two grounds. The Juvenile Court may not commit an adjudicated delinquent or one in need of supervision to the care and custody of DYFS and at the same time order DYFS to make a specific placement for the purpose of imposing the cost thereof on that agency. Even as a condition of probation, a requirement that a juvenile submit himself for psychiatric care must not entail excessive costs.

The trial court order is modified to vacate that portion thereof ordering DYFS to place D.F. in the Institute of Pennsylvania Hospital. In all other respects the order shall remain unaffected.