**Eloise INGRAHAM, as next friend, etc., et al., Plaintiffs-Appellants,**

v.

**Willie J. WRIGHT, I, Individually, etc., et al., Defendants-Appellees.**

No. 73-2078.

United States Court of Appeals, Fifth Circuit.

July 29, 1974.

Alfred Feinberg, Miami, Fla., for plaintiffs-appellants.

Frank A. Howard, Jr., Thomas G. Spicer, Leland E. Stansell, Jr., James A. Smith, Miami, Fla., for defendants-appellees.

Before RIVES, WISDOM and MORGAN, Circuit Judges.

RIVES, Senior Circuit Judge:

More than a century ago, a member of the Supreme Court of Indiana made the following observation:

"The husband can no longer moderately chastise his wife; nor, according to the more recent authorities, the master his servant or apprentice. Even the degrading cruelties of the naval service have been arrested. Why the person of the schoolboy, 'with his shining morning face,' should be less sacred in the eye of the law than that of the apprentice or the sailor, is not easily explained."

Cooper v. McJunkin, 1853 (4 Ind. (Porter) 290 (Stuart, J.). In the present case, we consider constitutional issues related to corporal punishment in the public school system of Dade County, Florida.

Plaintiffs filed on January 7, 1971, a complaint containing three counts. Counts One and Two were individual actions for compensatory and punitive damages brought by two junior high school students under 42 U.S.C. §§ 1981–1988, with jurisdiction claimed under 28 U.S.C. § 1331 and § 1343. The students claimed personal injuries resulting from corporal punishment administered by certain defendants in alleged violation of their constitutional rights. Count Three of the complaint was a class action, also brought under 42 U.S.C. §§ 1981–1988, with jurisdiction claimed under 28 U.S.C. § 1331 and § 1343. This class action filed on behalf of all students in the public school system of Dade County sought injunctive and declaratory relief against the use of corporal punishment throughout the county school system.

The plaintiffs presented their evidence on Count Three of the complaint

in a week long trial before the district court without a jury. Those who testified included sixteen students or former students, several parents and other relatives of students, a professor of educational psychology, and a number of school teachers and administrators, including the defendant Superintendent Edward Whigham. The evidence also included a photograph, stipulations, answers to interrogatories, school records and medical reports. At the close of the plaintiffs' case, the defendants moved for dismissal under Rule 41(b), F.R. Civ.P., which in relevant part provides:

"After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits."

The district court noted in its order that counsel for the parties then agreed that the evidence offered to support Count Three "would also be considered by the Court, as if upon motion for directed verdict, as having been offered on Counts One and Two, provided that certain additional testimony desired by Plaintiffs' counsel were placed in the record by deposition or stipulation." Thus, this case really involves one equity case, styled Count Three, and two law cases, styled Counts One and Two. The additional testimony was summarized in a stipulation. On February 23, 1973, the district court first dismissed Count Three of the complaint, and then concluded that a jury could not lawfully find that either of the plaintiffs in Counts One and Two sustained a deprivation of constitutional rights.

We hold that the district court erred in dismissing each of the three counts of plaintiffs' complaint, and, therefore, reverse and remand for further proceedings.

## I.

### JURISDICTIONAL ISSUES

A. Defendants assert that there is no federal jurisdiction over Count Three under 42 U.S.C. §§ 1981–1988 and 28 U. S.C. § 1331 and § 1343, because the Dade County School Board and the Superintendent of Schools in their official capacities are not "persons" amenable to civil rights actions. In support of this claim defendants cite City of Kenosha v. Bruno, 1973, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109. In *City of Kenosha*, the Supreme Court held that two municipalities in Wisconsin were not "persons" within the meaning of 42 U.S.C. § 1983. In Campbell v. Masur, 5 Cir. 1973, 486 F.2d 554, where a plaintiff sued a school superintendent and a school board in their official capacities only, the court sent the case back to the district court for re-examination and further consideration in light of *City of Kenosha*.[1]

Plaintiffs have sued Superintendent of Schools Edward L. Whigham in his individual capacity, as well as in his official capacity.[2] It is clear that

1. Also see Cheramie v. Tucker, 5 Cir. 1974, 493 F.2d 586, 587, where this Court held that various arms of the state government of Louisiana, such as the Department of Highways, are not persons within the meaning of 42 U.S.C. § 1983.

2. Willie J. Wright, I (a principal), Lemmie Deliford (an assistant principal) and Solomon Barnes (an assistant to a principal) have each also been sued in his official and individual capacity.

the school superintendent, sued as an individual, is a "person" within the meaning of § 1983. Sterzing v. Fort Bend Independent School District, 5 Cir. 1974, 496 F.2d 92, p. 93, n. 2; United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, 5 Cir. 1974, 493 F.2d 799. To hold otherwise would suggest the impossibility of suing any government official or employee under § 1983. *City of Kenosha, supra,* does not require or even intimate the possibility of such a result. The right to bring a § 1983 action against a state or local official is well established. See Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, and its progeny. Also see Moor v. County of Alameda, 1973, 411 U.S. 693, 700, 93 S.Ct. 1785, 36 L.Ed.2d 596.

■ Prior to the decision in *City of Kenosha,* a number of courts had held that cities were proper defendants under § 1983 where equitable relief was sought. See discussion in City of Kenosha v. Bruno, *supra,* 412 U.S. at 512–514, and at 516ff, 93 S.Ct. 2222 (Douglas, J., dissenting in part). The complaint in the present case, and all of the proceedings in the district court, occurred before *City of Kenosha* was decided. Taking these factors into consideration, the district court should on remand grant the likely request of plaintiffs to add the individual members of the Dade County School Board as parties defendant under Count Three of the complaint. Without regard to whether the plaintiffs may ultimately be entitled to any equitable relief against the School Board or its members, fairness and efficient judicial administration justify the addition of the individual school board members as parties insofar as the plaintiffs seek declaratory and equitable relief restraining the School Board from

authorizing or implementing corporal punishment in Dade County. See Rule 21, F.R.Civ.P.; Mullaney v. Anderson, 1952, 342 U.S. 415, 72 S.Ct. 428, 96 L. Ed. 458; United States v. Louisiana, 1957, 354 U.S. 515, 77 S.Ct. 1373, 1 L. Ed.2d 1525; Halladay v. Verschoor, 8 Cir. 1967, 381 F.2d 100; Rakes v. Coleman, E.D.Va.1970, 318 F.Supp. 181; 3A Moore ¶ 31.05[1].

■ B. Although not argued by the parties on this appeal, it is appropriate to examine whether Count Three of the instant case should have been heard by a three-judge district court.[3] Though neither party requested a three-judge district court, consent, either implied or express, cannot authorize a single judge to hear a case that falls within the terms of 28 U.S.C. § 2281. Sands v. Wainwright, 5 Cir. 1973, 491 F.2d 417, 424 (en banc); Borden Co. v. Liddy, 8 Cir. 1962, 309 F.2d 871; Americans United for Sep. of Church & State v. Paire, 1 Cir. 1973, 475 F.2d 462. The district court in the present case considered the question and ruled that a three-judge district court was not required. We agree.

Plaintiffs sought injunctive relief restraining the defendants, their agents and employees from inflicting any form of corporal punishment upon students in the Dade County public school system.[4] Plaintiffs did not request an injunction restraining the enforcement of any specific Florida statute, and in oral argument before this Court, counsel for plaintiffs stated, "We are not challenging the constitutionality of the Florida statute." Section 232.27 of Florida Statutes Annotated, provides:

"Each teacher or other member of the staff of any school shall assume such authority for the control of the

---

3. Counts One and Two, which are individual actions for damages, clearly do not require a three-judge district court. Therefore, if it were determined that a three-judge court is necessary to decide Count Three, we would still be obliged to consider most or all of the underlying facts in this case in order to review the district court's disposition of Counts One and Two.

4. Plaintiffs' request for injunctive relief restraining the defendants from administering corporal punishment in Charles R. Drew Junior High School is obviously included within the larger request for injunctive relief throughout the entire county system.

pupils as may be assigned to him by the principal and shall keep good order in the classroom and in other places in which he is assigned to be in charge of pupils, but he shall not inflict corporal punishment before consulting the principal or teacher in charge of the school, and in no case shall such punishment be degrading or unduly severe in its nature."

The injunctive relief sought by plaintiffs would not conflict with this provision, and would not extend beyond Dade County. By establishing limits upon the administration of corporal punishment, the statute inferentially permits local school boards to authorize such punishment. This statute does not mandate or require corporal punishment, however, nor does it compel local school boards to adopt regulations providing for corporal punishment. In fact, the statute would not prevent a local board from prohibiting corporal punishment in certain grade levels or throughout a county system.

The Dade County School Board adopted a policy which affirmatively authorized the use of corporal punishment in Dade County schools. It is the implementation of this policy, and the practices which have developed in Dade County under the authority of this policy, particularly in one junior high school, which the plaintiffs seek to enjoin. Although a regulation authorizing corporal punishment is consistent with F.S. 232.27, F.S.A. an injunction restraining the named defendants, their agents and employees from the use of corporal punishment would not require the invalidation of the Florida statute, and would not directly affect any county in Florida other than Dade County. Count Three, therefore, comes within the rule that where a challenged regulation or policy is of only local import, a single judge must hear the case. Board of Regents of University of Texas System v. New Left Education Project, 1972, 404 U.S. 541, 92 S.Ct. 652, 30 L. Ed.2d 697; Moody v. Flowers, 1967, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643;

Griffin v. School Board of Prince Edward County, 1964, 377 U.S. 218, 327, 328, 84 S.Ct. 1226, 12 L.Ed.2d 256; Rorick v. Board of Commissioners, 1939, 307 U.S. 208, 59 S.Ct. 808, 83 L.Ed. 1242; Ex parte Public National Bank, 1928, 278 U.S. 101, 49 S.Ct. 43, 73 L.Ed. 202; Ex parte Collins, 1928, 277 U.S. 565, 48 S.Ct. 585, 72 L.Ed. 990; Sands v. Wainwright, 5 Cir. 1973, 491 F.2d 417 (en banc).

## II.

## THE FACTS

As to the district court's findings or treatment of facts, appellate review is governed by one rule applicable to Count Three and by a different rule applicable to Counts One and Two. We have heretofore indicated that there were two separate orders of dismissal. Count Three was dismissed under Rule 41(b), F.R. Civ.P. "on the ground that upon the facts and the law the plaintiff has shown no right to relief." As authorized by that rule, the district court in effect rendered judgment on the merits against the plaintiffs and made findings as provided in Rule 52(a). See Emerson Electric Co. v. Farmer, 5 Cir. 1970, 427 F.2d 1082, 1086; Wright & Miller, Federal Practice & Procedure § 2371; Moore's Federal Practice ¶ 41.13[4]. The district court's order of dismissal as to Counts One and Two correctly recognized that, "The issue now before the Court is whether the evidence, viewed most favorably to plaintiffs is sufficient to permit a jury to return a verdict for plaintiffs on either or both of the First and Second Counts." On that issue, our review of the sufficiency of the evidence is governed by the familiar rule enunciated in Boeing Company v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374–375.

In its order of dismissal as to Count Three, the district court listed its "Findings of Fact" as follows:

"1. The Dade County public school system is the sixth largest in the nation, with approximately 12,500 teachers and administrative personnel oper-

ating 237 schools with a total student population in excess of 242,000.

"2. Corporal punishment is one of a variety of measures employed in the school system for the correction of pupil behavior and the preservation of order. Other alternative measures in use range from parent and student conferences, the use of guidance counselors and psychologists, where available, to suspension and expulsion. Corporal punishment is not utilized at all in sixteen schools in Dade County.

"3. Statutory authority for the use of corporal punishment in Florida is found in Florida Statutes, § 232.27, which deals with the duties of teachers in the control of pupils, but provides that a teacher " * * * shall not inflict corporal punishment before consulting the principal or teacher in charge of the school * * *." The Defendant School Board's policy as it existed when this suit was filed is more restrictive. It requires the principal to determine the necessity for corporal punishment, and to designate the time, place and person to administer the punishment, and in other ways limits the circumstances in which the punishment may be used. The policy was revised in November, 1971, and supplemented with detailed regulations, which prescribe additional limitations upon the nature, extent and circumstances of permissible punishment.

"4. There is no published schedule of infractions for which corporal punishment is authorized, nor any formal procedural requirements which must be observed before punishment may be administered.

"5. There has been a rather widespread failure to adhere to School Board policy regarding corporal punishment. Teachers have punished students without first consulting with their respective principals. More blows have been administered to students than authorized by the policy. Teachers have administered corporal punishment with only the student or students present. With the exception of a few cases, the punishments administered have been unremarkable in physical severity.

"The instances of punishment which could be characterized as severe, accepting the students' testimony as credible, took place in one junior high school."

We agree with and accept the expressed findings of the district court. However, those findings are somewhat meager considering the voluminous evidence presented in this case, and it is therefore appropriate for us to detail more fully what the testimony and other evidence reveals.

Dade County School Board Policy 5144 expressly authorizes the use of corporal punishment, and prescribes the procedures to be followed where a teacher feels that corporal punishment is necessary.[5] During the 1970–71 school

---

5. During the 1970–71 school year, Policy 5144 provided in relevant part as follows:
"II. Punishment: Corporal Punishment
"Punishment in the general sense is the inflicting of a penalty for an offense. Corporal punishment is generally applied to the body of the offender or is physical punishment as opposed to other forms of punishment and is administered as a means of changing the behavior of the student. Therefore, it is important to analyze whether or not this goal will be accomplished by such action.
"Corporal punishment may be used in the case where other means of seeking cooperation from the student have failed. If

it appears that corporal punishment is likely to become necessary, the teacher must confer with the principal. The principal will determine the necessity for corporal punishment and designate the time, place, and the person to administer said punishment. In any case, the student should understand clearly the seriousness of the offense and the reason for the punishment. Care should be taken that the period of time between the offense and the punishment is not so long as to cause undue anxiety in the pupil. The punishment must be administered in kindness and in the presence of another adult, at a time and under conditions not calculated

year, Policy 5144 provided, among other things, that the punishment be administered "in kindness and in the presence of another adult" and that "no instrument shall be used that will produce physical injury to the student, and no part of the body above the waist or below the knees may be struck."

The evidence shows that corporal punishment in Dade County during the relevant period consisted primarily, if not entirely, of "paddling." [6] Paddling involves striking the student with a flat wooden instrument [7] usually on the buttocks. The district court recognized that the evidence revealed "a rather widespread failure to adhere to School Board policy regarding corporal punishment." Many of the student witnesses gave testimony which indicated that their teachers in various schools did not always consult with the principal of the school before administering corporal punishment. A number of non-principals admitted in their answers to interrogations that they did not "regularly and routinely" confer with the principal before paddling students.[8] Student testimony also indicated, and the district

court found, that teachers sometimes administered corporal punishment with only the student or students present, whereas school board policy required the presence of another adult during the administration of corporal punishment.

In at least 16 of the 231 Dade County schools, corporal punishment was not utilized in the 1970–71 school year.[9] The evidence suggests that in most of those schools which did use corporal punishment, the punishment was normally limited to one or two licks, or sometimes as many as five, with no apparent physical injury to the children who were punished. Quoting from the district court's findings of fact, "The instances of punishment which could be characterized as severe * * * took place in one junior high school." This school was Charles R. Drew Junior High School, and the occurrences there merit description.

The experiences of individual students at Drew reveal the nature of the system of corporal punishment utilized at this educational institution. On October 6, 1970, a number of students, including

---

to hold the student up to ridicule or shame.

"In the administering of corporal punishment, no instrument shall be used that will produce physical injury to the student, and no part of the body above the waist or below the knees may be struck. The person administering the corporal punishment must realize his own personal liabilities if the student being given corporal punishment is physically injured.

"Corporal punishment should never be administered to a student whom school personnel know to be under psychological or medical treatment unless there has been a pre-conference with the school psychologist or the physician."

On November 3, 1971, almost ten months after this action was filed, Policy 5144 was extensively revised. As indicated by the district court, this revision included "detailed regulations, which prescribe additional limitations upon the nature, extent and circumstances of permissible punishment."

6. We recognize that the term "paddling" is a word of art. Plaintiffs in their brief refer to "beating." Similarly, the punishment is described in terms of "licks" and "blows,"

and the instruments of punishment are referred to as "paddles" and "boards."

7. Paddle size was not prescribed during 1970–71. Most paddles probably were within the range indicated by the November 3, 1971 revision of Policy 5144: "The instrument must be of wood and be no more than two feet long nor more than one-half inch thick and no more than four inches wide."

8. By stipulation dated October 10, 1971, the parties agreed that, "The total number of persons with the Dade County School System, other than school principals, who administered corporal punishment but did not regularly and routinely confer with the principal of the school in which they were employed during the school year commencing September 1970 was 59 (fifty-nine) prior to each paddling." (R. 1435) This stipulation was based on questionnaires prepared by the plaintiffs and completed by school officials and employees.

9. At least 10 of these schools did not administer corporal punishment as a matter of school policy. See stipulation of October 10, 1972. Also see district court finding 2.

fourteen-year-old James Ingraham, a named plaintiff, were slow in leaving the stage of the school auditorium when asked to do so by a teacher. A number of boys and girls involved in this incident were taken to the principal's office and paddled. James protested, claiming he was innocent, and refused to be paddled. Willie J. Wright, I, the principal called for the assistance of Lemmie Deliford, the assistant principal in charge of administration, and Solomon Barnes, an assistant to the principal. Barnes and Deliford held James by his arms and legs and placed him, struggling, face down across a table. Wright administered at least twenty licks.[10] After the paddling, Wright told James to wait outside his office—"he said if I move he was going to bust me on the side of my head"—(Tr. 144), but James went home anyway.

At home, James examined his injuries; according to him, his backside was "black and purple and it was tight and hot." (Tr. 146) James' mother took him to a local hospital. The examining doctor diagnosed the cause of James' pain to be a "hematoma." "The area of pain was tender and large in size, and * * * the temperature of the skin area of the hematoma was above normal which is a sign of inflammation often associated with hematoma."[11] The doctor prescribed pain pills, a laxative, sleeping pills and ice packs, and advised James to stay at home for at least a week (Tr. 148). A different doctor ex-

amined James on October 9, when he returned to the hospital for treatment, and on October 14. This doctor described James' injury as follows: "The patient's subjective [sic] signs of injury included a hematoma approximately six inches in diameter which was swollen, tender and purplish in color. Additionally, there was serousness or fluid oozing from the hematoma."[12] On October 14, eight days after the paddling, this doctor indicated that James should rest at home "for next 72 hours."[13] James testified that it was painful even to lie on his back in the days following the paddling, and that he could not sit comfortably for about three weeks (Tr. 149).

Roosevelt Andrews, the other named plaintiff, testified that he was paddled about ten times in one year at Drew (Tr. 273). He was paddled a number of times by his physical education teachers for being late or for not "dressing out."[14]

On one occasion, a teacher stopped Roosevelt, told him he could not possibly get to his next class in time and then took him to Barnes. Barnes told Roosevelt to go into a bathroom with a number of other boys. Barnes allegedly lined about 15 boys up against the urinals and paddled them. According to Roosevelt, the blows must have hurt, because some of the boys were "hollering, cry, prayed, and everything else" [sic] (Tr. 294). After the other boys left, Roosevelt told Barnes that he would have made it to class if the teacher had

---

10. The district court found that James Ingraham "received 20 licks with a wooden paddle, which produced a painful and serious hematoma on his buttocks." (R. 1561)

11. Stipulated testimony of Dr. Fernando Milanes (R. 1557).

12. Stipulated testimony of Dr. Carlos Gamez (R. 1558).

13. Exhibit 8, in form of prescription signed by Dr. Gamez.

14. "Dressing out" refers to putting on the proper uniform for physical education class. According to Roosevelt, he was once paddled for not having white socks. His teacher

refused to listen to his explanation that his socks had been stolen. On another occasion, Roosevelt was paddled for not having tennis shoes, although he tried to explain to the teacher that someone had stolen his shoes and that he could not get new ones because his family could not afford them.

Another student, Reginald Bloom, testified that he was paddled for not having gym shorts, although his shorts had been stolen. Other students at Drew and other schools also testified to paddlings in physical education class, for such offenses as not dressing out, lateness, talking at inappropriate times, and other minor misconduct. These paddlings normally consisted of one or two or sometimes three licks.

not stopped him. Barnes told Roosevelt to bend over. Roosevelt refused. Then, according to Roosevelt, Barnes

> "pushed me against the urinate thing, the bowl, and then he snatched me around to it and that's when he hit me first. He first hit me on the backsides and then I stand up and he pushed me against the bathroom wall, them things—that part the bathroom, the wall * * * Between the toilets, he pushed me against that and then he snatched me from the back there and that's when he hit me on my leg, then hit me on my arm, my back and then right across my neck, in the back here."

(Tr. 295.) Incensed over his treatment, Roosevelt complained to Wright, but Wright seemed to support Barnes, his co-administrator.

At a later time, Wright paddled Roosevelt, apparently for the breakage of some glasses in sheet metal class, although Roosevelt claimed it was not his fault. Roosevelt testified that during this paddling, his wrist was hit, and that painful swelling occurred. Roosevelt went to see a doctor about his wrist. The doctor gave him pain pills and advised him to keep something cold on his wrist.[15] For about a week his wrist hurt, and he could not use his arm.

Donald Thomas testified that Barnes carried a paddle with him when he walked around the school and that Deliford carried brass knuckles.[16] Donald further testified to a scheme of punishment used in the auditorium. The seats were numbered and each student had an assigned seat. If a student misbehaved, his number was put on the board. Then Barnes would come into the auditorium and paddle the students whose numbers were listed, without asking who had done what. About five to eight students were paddled every day, generally receiving four or five licks or so each. Donald claimed he was paddled under these circumstances between 5 and 10 times. Another student, Nicky Williams, who was paddled under this system, complained that Barnes would not listen to any explanations.

Daniel Lee, who was paddled "lots of times" (Tr. 463) at Drew, described how on one occasion Barnes had a number of students "in a line, holding onto the chair, already paddling them,"[17] and asked him to come over and "get a little piece of the board." (Tr. 480–481.) Daniel asked what he had done, and Barnes allegedly grabbed him and tried to throw him on the chair. In the ensuing confusion, Barnes hit Daniel on the hand four or five times.[18] The hand

15. Roosevelt's mother, Mrs. Willie Everett, supported Roosevelt's description of his wrist injury.

16. James Ingraham, Roosevelt Andrews, Daniel Lee, Reginald Bloom, Ray Jones and Nicky Williams also testified that Barnes carried a paddle with him around the school. Mrs. Everett, Alphonse Hicks and Larry Jones saw Barnes at school with brass knuckles. Reginald Bloom claimed he saw Deliford with brass knuckles. The apparent visibility of the paddle and of the brass knuckles may have affected the atmosphere at Drew.

17. As described by Daniel Lee and other witnesses, a student about to be paddled at Drew was sometimes required to bend over the back of a chair with his hands on the front of the seat of the chair. A number of witnesses testified that if the student let the chair go, or in some other fashion failed to

take the punishment as prescribed, extra licks were given. Daniel Lee testified that on one occasion, Deliford told a group he was punishing that, "If you let go, if you let the chair go, every time you let the chair go, that's fifteen more licks. If you count to three and you don't be back down on the chair, that's fifteen more licks." (Tr. 479; see also 477.)

18. On cross-examination, the following exchange occurred:

> "Q. Are you telling the Court that Mr. Barnes hauled off and deliberately hit you on the hand?
> "A. Yes, sir; because he tried to throw me against the chair, you know, and I wouldn't get over there and so he grabbed me and hit me on the hand with the board.
> "Q. He was trying to hit you on the rear end, wasn't he?
> "A. No.

swelled and hurt "and the bone was—it seems like the bone was going to come out" (Tr. 481), so Daniel's mother took him to the hospital for an X-ray. According to Daniel, a bone in his right hand was fractured. The Court, observing Daniel's hand, stated that "It seems to me to be disfigured, a portion of his right knuckle is enlarged to some degree." Daniel claimed that his hand still hurt, and swelled if he tried to use it.

Reginald Bloom testified that he was paddled at Drew about 15 times. One time Deliford paddled Reginald about fifty licks for allegedly making an obscene phone call to a teacher. Reginald claimed at the time that he had not made the call, and later another boy confessed to making it. Reginald testified on cross-examination that Deliford seemed to be hitting him as hard as he could, and that after the paddling was over, he had to go home because he couldn't sit down. A doctor examined Reginald's buttocks and prescribed ice packs. Reginald found it painful to sit down for about three weeks. Reginald's mother testified that her son's buttocks were "black and blue right across," swollen, and sore. She testified further that she applied ice packs to his buttocks for about three days or more after he was paddled. Another time Reginald and some other boys were called into the principal's office and accused of fighting on the way home from school. When the boys refused to be paddled, Deliford, Barnes and Wright allegedly manhandled one of the boys:

"Mr. Deliford grabbed him and Mr. Barnes and Mr. Deliford started jumping on him, throwing him around the room in the office.

"Then Mr. Wright, he got with Mr. Deliford and Mr. Barnes and started throwing the boy around the room,

hitting him, throwing him on the table."

(Tr. 517.) The boy cried out that the men had broken his hand and two weeks later came back to school with a bandage on his hand. Reginald also testified that Barnes paddled boys for chewing gum and for not tucking in their shirttails.

Ray A. Jones and a boy named Carson were brought to the office at Drew by a policeman for "playing hooky." Deliford and Barnes gave each boy about fifty licks, causing both boys to cry. Two girls were present during this punishment and after the boys were paddled, the girls received about five licks each. Ray testified that he was unable to sit comfortably for about two weeks. Ray's grandmother stated that when she looked at Ray's buttocks, she saw "big swollen places."

Rodney Williams testified that because he wanted to wipe some foreign matter off his seat in the auditorium before sitting down, his number was put on the board and Barnes later took him to his office. Because he thought he was innocent, Rodney refused to "hook up." [19] Rodney testified that Barnes then hit him five or ten times on his head and back with a paddle, and then hit him with a belt. The side of Rodney's head swelled, and an operation proved necessary to remove a lump of some sort which had developed where Rodney had been struck. Rodney was out of school for about a week, and felt that the operation affected his memory and thinking. Another time, after Deliford had given him ten licks, Rodney's chest hurt and he threw up "blood and everything" (Tr. 601). Perhaps because he had asthma and heart trouble of some sort, Rodney also reacted to this paddling by "shaking all over" and "trembling," and required treatment at a local hospital. On a later occasion, a paddling

---

"Q. Are you saying he deliberately hit you on the hand?
"A. Yes, sir.
"Q. That has made your hand swell up?
"A. Yes, sir." (Tr. 487–488.)

19. To assume a position standing in back of a chair, with hands on the seat of the chair, in preparation to being paddled.

by Wright again caused Rodney to cough up blood (Tr. 604).

Larry Jones testified that physical education teachers at Drew paddled him about ten times and that Deliford paddled him a "heap of times"—about ten. Several times Larry received ten licks. On one occasion, when Larry refused to be paddled, "he [Deliford, or perhaps Barnes] had to start hitting me with that stick, and he put two knots on my head" (Tr. 651).

Janice Dean testified that, on her first day at Drew, she did not know about assigned seats in the auditorium and sat in the wrong place. As a result, Deliford gave her five licks. Another time, when Janice was sent to the office, Barnes administered fifteen licks, apparently without knowledge of the alleged misconduct, on a theory he allegedly explained as follows: "He said he knew we had done something wrong or we wouldn't have been there." (Tr. 819).

Preston Sharpe testified that during four years at Drew, Deliford paddled him about ten times. One time Preston was paddled for having his shirttail hanging out. Another time, when he was supposed to receive ten licks, Preston received five extra licks for not reassuming a paddling position quickly enough after one of the licks, and three extra licks for allowing the chair to move and hit a door.

Nathaniel Evans testified that during one year at Drew, he was paddled four times. On one occasion, when the typing class was noisy, Barnes gave each of the fifteen students five licks. Another time, when Barnes was trying to find out who had been whistling, he took a class of 30–50 students and methodically began to paddle each student in an attempt to locate the one who had been whistling. After about half of the class had been paddled, some students told Barnes who had whistled, and the rest of the class was spared. Nathaniel received ten licks on another occasion when his name, along with six others, was written on the board in the auditorium.

### III.

### CRUEL AND UNUSUAL PUNISHMENT

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment." It is applicable to the states through the due process clause of the Fourteenth Amendment. Robinson v. California, 1962, 370 U.S. 660, 82 S. Ct. 1417, 8 L.Ed.2d 758; Furman v. Georgia, 1973, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.

A number of federal courts have held that corporal punishment of school children is not *per se* a violation of the constitutional prohibition against cruel and unusual punishment. Ware v. Estes, N.D.Tex.1971, 328 F.Supp. 657, aff'd per curiam 5 Cir. 1972, 458 F.2d 1360; Whatley v. Pike County Board of Education, N.D.Ga.1971, C.A. 977 (three-judge district court); Glaser v. Marietta, W.D.Pa.1972, 351 F.Supp. 555; Sims v. Board of Education of Independent School Dist. No. 22, D.N.M. 1971, 329 F.Supp. 678.[20] We agree that

---

20. In Gonyaw v. Gray, D.Vt.1973, 361 F. Supp. 366, 368, as one ground for dismissal of an action brought by parents of students subjected to corporal punishment, the court stated that, "This statute does not offend the protection against cruel and unusual punishment secured by the Eighth Amendment, since this amendment provides a limitation against penalties imposed for criminal behavior. * * * * Since neither plaintiff was punished for an offense which was criminal in nature, the Eighth Amendment does not proscribe the conduct assigned to the defendants." (Citations omitted.)

We find this approach unpersuasive. It was succinctly stated in Vol. 6 Harv.Civ. Rights—Civ.Lib.L.Rev., Corporal Punishment in the Public Schools, p. 585 n. 24:

"In Trop v. Dulles, 356 U.S. 86, 94–100 [78 S.Ct. 590, 2 L.Ed.2d 630] (1958), the Supreme Court, in applying the eighth amendment to all punishments inflicted pursuant to 'penal laws,' set forth two tests to determine the meaning of penal. First, there must be the imposition of a 'disability for the purpose of punishment.' *Id.* at 96 [78 S.Ct. 590]. Second, there must be the prescription of a 'consequence

at the present time corporal punishment *per se* cannot be ruled violative of the Eighth Amendment. Mild or moderate use of corporal punishment as a disciplinary measure in an elementary or secondary school normally will involve only transitory pain of a non-intense nature and will not cause intense or sustained suffering or permanent injury. For this reason, although many might object to corporal punishment for a variety of reasons, such punishment *per se* cannot presently be held to be "excessive" in a constitutional sense,[21] or so "degrading" to the "dignity" of school children as to violate the Eighth Amendment.[22] Al-though the scope of the Eighth Amendment admittedly is not "static" and must draw its meaning from "evolving standards of decency," Trop v. Dulles, 1958, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630, it is significant that a large number of states continue to authorize the use of moderate corporal punishment,[23] and that corporal punishment apparently is still utilized in many school systems. Faced with this evidence of what is apparently considered appropriate by the American people, we would be loath to suggest that at this time corporal punishment is "unacceptable to contemporary society," Furman v.

that will befall one who fails to abide by regulatory provisions . . . .' *Id.* at 97 [78 S.Ct. 590].

"Infliction of corporal punishment by public school personnel meets both tests." Corporal punishment of schoolchildren is "punishment" in every sense of the word, whether it is called "criminal" or "civil." Cf. In re Gault, 1967, 387 U.S. 1, 17, 87 S.Ct. 1428, 18 L.Ed.2d 527. Corporal punishment is used by state officials to punish students for misbehavior committed during attendance at school, and resembles statutorily prescribed punishments for crimes in its purposes and effects. Some of the offenses punished by corporal punishment are in fact essentially criminal in nature, such as assaults or destruction of property. No doubt for these reasons, most courts which have considered the constitutionality of corporal punishment have assumed that such punishment may be evaluated under eighth amendment standards. See especially Nelson v. Heyne, 7 Cir. 1974, 491 F.2d 352, and Bramlet v. Wilson, 8 Cir. 1974, 495 F.2d 714. In *Bramlet* the court said, "an excessive amount of physical punishment [in a public school setting] could be held to be cruel and unusual and therefore prohibited." The court also stated, "the designation of conduct as other than 'punishment' is simply a label of convenience and will not obviate an eighth amendment inquiry. Knecht v. Gillman, 488 F.2d 1136 (8th Cir. 1973)."

In Jackson v. Bishop, 8 Cir. 1968, 404 F.2d 571, and Wright v. McMann, 2 Cir. 1967, 387 F.2d 519, courts found impermissible cruelty in offensive "punishments" devised by prison officials, and at least some members of the Supreme Court have acknowledged the propriety of these findings. See Furman v. Georgia, 1972, 408 U.S. 238, 384, 92 S.Ct. 2726, 33 L.Ed.2d 346 (Chief Justice Burger dissenting, joined by Justices Black-mun, Powell and Rehnquist). We think punishments devised by school officials are similarly subject to Eighth Amendment scrutiny. Paraphrasing the opinion in In re Gault, *supra*, 387 U.S. at 47, 87 S.Ct. 1428, it would indeed be surprising if the Eighth Amendment protected hardened criminals but not school children.

21. O'Neil v. Vermont, 1892, 144 U.S. 323, 339, 12 S.Ct. 693, 36 L.Ed. 450 (Field, J., dissenting); Furman v. Georgia, *supra*, 408 U.S. at 279–280, 92 S.Ct. 2726 (Brennan, Jr., concurring).

22. Furman v. Georgia, *supra*, 408 U.S. 271–273, 92 S.Ct. 2726 (Brennan, Jr., concurring); Trop v. Dulles, 1958, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630.

23. According to a Report of the Task Force on Corporal Punishment published in 1972 by the National Education Association, at p. 26, submitted by the plaintiffs, corporal punishment is banned by state law in New Jersey and Massachusetts, and by state school board policy in Maryland. It is also banned, according to this report, in a number of large cities. However, at p. 24 of the report, it is stated that 13 states specifically permit corporal punishment, while in other states the teacher is given the same authority as the parent to discipline the child, or is simply authorized to maintain order and discipline in the classroom. Although the situation may have changed somewhat since 1972, apparently corporal punishment of school children is still allowed in a large number of jurisdictions. This contrasts with the circumstances in Jackson v. Bishop, 8 Cir. 1968, 404 F.2d 571. In that case, where the court held that the use of the strap in the Arkansas prisons violated the Eighth Amendment, the court took into consideration the fact that only two states still permitted the use of the strap. See 404 F.2d at 580.

Georgia, *supra*, 408 U.S. at 277–279, 92 S.Ct. 2726 (Brennan, J., concurring), or that it is "abhored" by popular sentiment, Furman v. Georgia, *supra*, 408 U.S. at 332, 92 S.Ct. 2726 (Marshall, J., concurring).[24]

Examining the specific policies on corporal punishment promulgated by the Dade County School Board, we find in them no violation of the Eighth Amendment. These policies do nothing more than authorize the mild or moderate use of such punishment. Policy 5144, revised effective August 5, 1970,[25] provides that the punishment must be administered "in kindness." "[N]o instrument shall be used that will produce physical injury to the student, and no part of the body above the waist or below the knees may be struck." Further, corporal punishment "should never be administered to a student whom shcool personnel know to be under psychological or medical treatment unless there has been a pre-conference with the school psychologist or the physician."

Policy 5144 was revised extensively effective November 3, 1971. This revision imposes specific limits on the number of strokes—a maximum of five strokes for elementary school children and a maximum of seven strokes for junior and senior high school children.

It requires the use of an instrument "calculated to eliminate possible physical injury." The punishment must be administered "posteriorly," and "under no circumstances shall a student be struck about the head or shoulders." The former provision as to students under psychological or medical treatment is retained. Emphasis upon consideration of the "nature of the misconduct" and the "seriousness of the offense," and the requirement of recording the "infraction of rules which caused the punishment," make it clear that the punishment is not to be inflicted arbitrarily or without cause. This revision is not obnoxious to the Eighth Amendment; it represents an effort to insure through specific guidelines that corporal punishment in Dade County will not go beyond "the moderate use of physical force or physical contact, as may be necessary to maintain discipline and to enforce school order and rules."

Although Policy 5144 does not on its face conflict with the Eighth Amendment, it is necessary to inquire further and to determine whether corporal punishment as applied in the Dade County schools offends Eighth Amendment standards. In fact, we deem it more important to know how corporal punishment is actually administered than to know the relevant rules or regulations.[26]

---

24. The dissenters in Furman v. Georgia emphasized the fact that "Capital punishment is authorized by statute in 40 States, the District of Columbia, and in the federal courts for the commission of certain crimes" (408 U.S. at 385, 92 S.Ct. at 2801), and that juries acting as "'the conscience of the community'" (408 U.S. at 388, 92 S.Ct. 2726), continued to impose capital punishment. See 408 U.S. at 385–391, 92 S.Ct. 2726 (Burger, C. J., dissenting). Justice Brennan suggests, however, that "The acceptability of a severe punishment is measured, not by its availability, for it might become so offensive to society as never to be inflicted, but by its use." 408 U.S. at 279, 92 S.Ct. at 2747. The evidence showed that capital punishment had actually been imposed only rarely in recent years. See 408 U.S. at 291 n. 40, 92 S.Ct. 2726. The plaintiffs do not suggest that corporal punishment has become so offensive that it is no longer in general use in many States.

25. Policy 5144 was revised again on December 9, 1970, but there were no substantive changes in those parts of the policy dealing with corporal punishment.

26. The opinion of Judge (now Justice) Blackmun in Jackson v. Bishop, 8 Cir. 1968, 404 F.2d 571, 579, 580, finds that corporal punishment in prisons is difficult to adequately control by rules or regulations:

"We are not convinced that any rule or regulation as to the use of the strap, however seriously or sincerely conceived and drawn, will successfully prevent abuse. * * * Rules in this area seem often to go unobserved. * * * Regulations are easily circumvented. * * * Corporal punishment is easily subject to abuse in the hands of the sadistic and the unscrupulous. * * * Where power to punish is granted to persons in lower levels of administrative authority, there is an inherent and natural difficulty in enforcing the limitations of

■ From the evidence presented, we cannot say that the actual practice of corporal punishment in the Dade County school system as a whole violates the Eighth Amendment. However, we conclude that the plaintiffs' evidence as to the pattern, practice and usage of corporal punishment at Drew Junior High School was such that the trial court erred in dismissing Count Three under Rule 41(b), F.R.Civ.P., and also erred in dismissing Counts One and Two.

It is unclear whether the district court directly considered whether the pattern of punishment at Drew is violative of the Eighth Amendment. The district court found that "The instances of punishment which could be characterized as severe, accepting the students' testimony as credible, took place in one junior high school." There is no doubt that this is a reference to Drew. In its conclusions of law, the district court declared that "Considering the system as a whole, there is no showing * * *

[of a violation of the Eighth Amendment]." At another point, the district court stated that "The evidence has not shown that corporal punishment in concept, or as authorized by the School Board, or as applied throughout the system, is arbitrary, capricious, unreasonable or wholly unrelated to the legitimate state purpose of determining its educational policy." Apparently the district court felt that a constitutional violation could be shown only by evidence sufficient to prove employment of cruel and unusual punishment throughout the entire Dade County school system.

■ We think that such an approach would be incorrect. In our view, a violation of the Eighth Amendment can occur at the level of a single educational institution. The record in this case demonstrates that individual schools in Dade County have great independence in the development of a policy or system as to corporal punishment.[27] This makes it appropriate to examine whether the au-

that power. * * * There can be no argument that excessive whipping or an inappropriate manner of whipping or too great frequency of whipping or the use of studded or overlong straps all constitute cruel and unusual punishment. But if whipping were to be authorized, how does one, or any court, ascertain the point which would distinguish the permissible from that which is cruel and unusual?"

" * * * we have no difficulty in reaching the conclusion that the use of the strap in the penitentiaries of Arkansas is punishment which, in this last third of the 20th century, runs afoul of the Eighth Amendment; that the strap's use, irrespective of any precautionary conditions which may be imposed, offends contemporary concepts of decency and human dignity and precepts of civilization which we profess to possess * * *."

The problems of control suggested in *Jackson* must also exist to some extent in schools, although perhaps to a lesser degree. It is for this reason that we are especially concerned with the actual administration of corporal punishment in the Dade County schools. If we found that adequate controls did not exist, or could not be established, we would be forced to consider adopting the remedy used in *Jackson*, namely, an injunction against any use of corporal punishment. That result must ensue if the controls prove inadequate. It has been cogently argued

that a total ban on this punishment is the only effective control:

"While theoretically corporal punishment need not be brutal, there is no assurance that it will be inflicted moderately or responsibly. In the heat of anger, especially if provoked by personal abuse, some teachers are likely to exceed legal bounds. Moreover, if limited corporal punishment were permitted, controls would be unlikely to prevent the 'really unmistakable kind of satisfaction which some teachers feel in applying the rattan.[19] A total ban of this punishment would provide far more effective control.[20]

"19. J. Kozol, Death at an Early Age 16–17 (1967).

"20. A rule forbidding all corporal punishment would probably receive more compliance than the common law principles because all parties involved are more likely to be aware of it and conscious of any violation. This would likely be reinforced by the added case of convicting a violator, simply by holding the school official involved in contempt of a court order, where injunctive relief is obtained."

6 Harv.Civ.Rights—Civ.Lib.L.Rev., Corporal Punishment in the Public Schools, p. 585.

27. This is reflected by the system developed at Drew, as well as by the fact that at least sixteen schools have discontinued the use of corporal punishment.

thorities at Drew imposed a system of punishment violative of the Eighth Amendment.[28]

From the evidence presented, it appears that Wright, the principal; Deliford, the assistant principal; and Barnes, an assistant to the principal, all agreed either explicitly or implicitly to impose a harsh regime upon the students at Drew. This is dramatically illustrated by their cooperation in administering corporal punishment to James Ingraham. It is further demonstrated by other instances where two or all three administrators were present during paddlings, or were aware of paddlings after they occurred.[29] Considering the evidence as a whole, it would be incredible to find that any one of these three individuals was unaware of the punishment policy pursued by the other two. Thus, the regime at Drew Junior High School was in fact a system of punishment established and imposed by those in authority.

■ The injuries sustained by various students at Drew demonstrate that the punishment meted out at this school was often severe, and of a nature likely to cause serious physical and psychological damage.[30] The evidence of paddlings for relatively minor offenses, sometimes without any opportunity for the student to explain what happened, show that the punishment was sometimes arbitrary. The frequency of the use of corporal punishment suggests real oppressiveness.

■ Whether punishment is cruel and unusual in a constitutional sense depends to a significant degree upon the circumstances surrounding the particular punishment. O'Neil v. Vermont, 1892, 144 U.S. 323, 337, 12 S.Ct. 693, 36 L.Ed. 450 (Field, J., dissenting); Robinson v. California, *supra*; Furman v. Georgia, *supra*.[31]

In the present case, children aged twelve through fifteen were punished

28. Eighth Amendment cases in analogous situations support this approach. In Nelson v. Heyne, 7 Cir. 1974, 491 F.2d 352, the Seventh Circuit concluded that the district court did not err in deciding that disciplinary beatings at the Indiana Boys School constituted cruel and unusual punishment. This school had a population of about 400 juveniles. In Wright v. McMann, 2 Cir. 1967, 387 F.2d 519, the Second Circuit held that the allegations that the punishments imposed at a particular New York State prison violated the Eighth Amendment should not have been dismissed.

29. For example, after Roosevelt Andrews was paddled by Barnes in a bathroom, he complained to Wright while Deliford was also present, and his father later complained to Barnes, Deliford and Wright. On a later occasion, Wright paddled Andrews and allegedly hit him on the wrist while Deliford and Barnes were present. Reginald Bloom testified that Deliford, Wright and Barnes manhandled and struck a boy suspected of fighting. Ray Jones testified that Deliford and Barnes were both present when he and another student received fifty licks each, and that the two administrators took turns giving the licks. Larry Jones testified that Deliford and Barnes were both present when he received "two knots on my head."

30. The district court stated in the order of dismissal that, "After having heard the testimony in this case, this Court believes that corporal punishment may be administered in such a way that the resultant psychological harm to some students will be substantial and lasting."

31. In O'Neil v. Vermont, Justice Field in dissent opined that while the Eighth Amendment was usually applied to punishments which inflicted torture, and which were attended with acute pain and suffering, it had a wider applicability:

"The inhibition is directed, not only against punishments of the character mentioned, but against all punishments which by their excessive length or severity are greatly disproportioned to the offences charged. The whole inhibition is against that which is excessive * * *." 144 U.S. 339-340, 12 S.Ct. 699.

Justice Marshall in Furman v. Georgia, 408 U.S. at 324-327, 92 S.Ct. 2726, argues persuasively that Justice Field's approach was adopted by the Court in later cases, including Howard v. Fleming, 1903, 191 U.S. 126, 24 S.Ct. 49, 48 L.Ed. 121; Weems v. United States, 1910, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793; Louisiana ex rel. Francis v. Resweber, 1947, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422, and Trop v. Dulles, 1958, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630. In Robinson v. California, 1962, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, the Court held that a statute which made addiction to nar-

for alleged misconduct at school. In most instances, this misconduct did not involve physical harm to any other individual or damage to property. Some students claim they never engaged in misconduct at all, but were not given an adequate opportunity to show their innocence or were ignored when they attempted to explain why they did not deserve punishment.

The system of punishment utilized at Drew resulted in a number of relatively serious injuries, and thus clearly involved a significant risk of physical damage to the child. Corporal punishment also creates a risk of psychological damage. Dr. Scott Kester, an assistant professor of educational psychology at the University of Miami, testified that corporal punishment could damage a child's development by engendering anxiety, frustration, and hostility, or by causing sheer pathological withdrawal or hatred of the school environment. He further commented that since children model their behavior after adults, a child who is corporally punished may learn from this that physical force is an appropriate way in which to handle conflicts. Dr. Kester emphasized that the child who is corporally punished often becomes more aggressive and more hostile than he was prior to his punishment.

The evidence shows that corporal punishment is only one of a variety of measures available to school officials to punish students and to correct behavior. As found by the district court, "alternative measures in use range from parent and student conferences, the use of guidance counselors and psychologists, where available, to suspension and expulsion." [32]

Taking into consideration the age of the individuals, the nature of misconduct involved, the risk of physical and psychological damage, and the availability of alternative disciplinary measures, we conclude that the system of punishment at Drew was "excessive" in a constitutional sense. The severity of the paddlings and the system of paddling at Drew, generally, violated the Eighth Amendment requirement that punishment not be greatly disproportionate to the offenses charged. Our review of the evidence has further convinced us that the punishment administered at Drew was degrading to the children at that institution.

 Our result is not inconsistent with Ware v. Estes, *supra,* and other cases involving corporal punishment of children. In the *Ware* case, there was evidence of abuse by some of the teachers in the Dallas school district, but there is no indication that the system of

cotics a misdemeanor inflicted a cruel and unusual punishment. The Court stated that the penalty provided by the statute—ninety days—was not, in the abstract, cruel and unusual. However, the Court classified narcotics addiction as an illness, and noted that, "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." 370 U.S. 667, 82 S.Ct. 1421.

32. In 1972, a Task Force of the National Education Association suggested a number of alternatives to the use of corporal punishment and proposed a "Model Law Outlawing Corporal Punishment":

"Corporal Punishment of Pupils
"No person employed or engaged by any educational system within this state, whether public or private, shall inflict or cause to be inflicted corporal punishment or bodily pain upon a pupil attending any school or institution within such education

system; provided, however, that any such person may, within the scope of his employment, use and apply such amounts of physical restraint as may be reasonable and necessary:

"1) to protect himself, the pupil or others from physical injury;
"2) to obtain possession of a weapon or other dangerous object upon the person or within the control of a pupil;
"3) to protect property from serious harm; and such physical restraint shall not be construed to constitute corporal punishment or bodily pain within the meaning and intendment of this section. Every resolution, bylaw, rule, ordinance, or other act or authority permitting or authorizing corporal punishment or bodily pain to be inflicted upon a pupil attending a school or educational institution shall be void."
See Report of The Task Force on Corporal Punishment, National Education Association, p. 29–A.

punishment in the school system as a whole, or in any particular school, approached the severity and arbitrariness of the system developed at Drew. Also, the court in *Ware* noted that in one case where a student was severely injured, the assistant principal responsible for the injury was suspended from his duties for several months. There is no indication from the record in this case that any efforts were made in the relevant time period to control or to moderate the system of punishment established by Wright, Deliford and Barnes.[33]

In Nelson v. Heyne, 7 Cir. 1974, 491 F.2d 352, 354 n. 4, the Seventh Circuit states that, "The law appears to be well settled in both state and federal jurisdictions that school officials do not violate 8th Amendment proscriptions against cruel and unusual punishment *where the punishment is reasonable and moderate.*" (Emphasis added.) In the *Nelson* case, the court agreed with the district court's conclusion that paddlings administered by guards at the Indiana Boys School violated the Eighth Amendment. The relevant facts in that case, as described by the Seventh Circuit panel, are comparable to the facts developed in the district court with regard to Drew.

Since the plaintiffs' evidence makes a prima facie case of violation of the Eighth Amendment at Drew Junior High School, the dismissal of Count Three of the complaint must be reversed and remanded to the district court for further proceedings. While the defend-

ants must, of course, be afforded an opportunity to offer evidence, the district court may find no reason to require the plaintiffs to offer their evidence a second time. It may proceed with the case as though defendants' motion for dismissal had been denied. See Federal Deposit Insurance Corp. v. Mason, 3 Cir. 1940, 115 F.2d 548; Gulbenkian v. Gulbenkian, 2 Cir. 1945, 147 F.2d 173; 5 Moore ¶ 41.13[2].

The dismissal of Counts One and Two must be reversed and remanded for further proceedings consistent with this opinion. Our examination of the record convinces us that there was sufficient evidence produced by James Ingraham and Roosevelt Andrews to avoid a directed verdict. There was evidence of a system of punishment violative of the Eighth Amendment. There was further evidence from which a jury might conclude that Ingraham and Andrews were victims of this system. Ingraham's description of how he was punished, and the medical evidence concerning the extent of his injuries, would justify sending his case to the jury. Andrews' description of Barnes' alleged assault upon him in the bathroom, and his description of his paddling by Wright in which his wrist was injured, are enough to avoid a directed verdict. On remand, the district court may allow the joinder of whatever state claims the plaintiffs may have, in accordance with the rules concerning pendent jurisdiction. See United Mine Workers v. Gibbs, 1966, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218.[34]

33. Superintendent Whigham testified that he believed there was "an inquiry or objection to that incident [Ingraham paddling of October 6, 1970] by the area office" (Tr. 103). However, Earl Wells, a school district director and administrator, who investigated the Ingraham paddling, testified that as a result of his investigation, "I formulated an opinion that Mr. Wright had a right to paddle the child" (Tr. 234). When asked whether he had formulated an opinion as to whether or not Mr. Wright acted appropriately concerning the paddling of Ingraham, Wells replied, "I think he did" (Tr. 234). Wells explained that he formulated his opinion on the basis of Wright's intent, but admitted that he did not know whether Ingra-

ham had resisted the paddling, and did not find out how many licks Ingraham had received (Tr. 235). We note that specific intent to deprive a person of his constitutional rights is not necessary to maintain a civil rights action. Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492; Pierson v. Ray, 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288; Whirl v. Kern, 5 Cir. 1969, 407 F.2d 781 and cases cited therein.

34. Counsel for defendants almost conceded as much upon oral argument when in response to an inquiry he stated:

"Your Honor. The class action count was an equitable matter that was tried to the court. When the evidence was finished on

▮ Assuming that Counts One and Two continue to be for jury trial and unless otherwise stipulated, the issues of fact common to the actions at law and the suit in equity must first be heard and determined by a jury's verdict rendered on one or both of Counts One and Two. Beacon Theatres v. Westover, 1959, 359 U.S. 500, 79 S.Ct. 948, 3 L. Ed.2d 988; Dairy Queen v. Wood, 1962, 369 U.S. 469, 473, 82 S.Ct. 894, 8 L.Ed. 2d 44; Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp., 5 Cir. 1961, 294 F.2d 486; Wright & Miller, Federal Practice and Procedure: Civil § 2338.

▮ The complaint is somewhat unclear as to whether the plaintiffs allege that Superintendent Whigham is liable for damages for the paddlings to Ingraham and Andrews. Paragraph 11 of the Complaint states that, "Upon information and belief, the defendant Whigham and/or his agents and employees in the administrative hierarchy of the Dade County school system have knowingly lent their tacit or explicit support and approval to the methods of discipline and behavorial control described herein." Yet neither the "First Cause of Action," relating to Ingraham, nor the "Second Cause of Action," relating to Andrews, mentions Whigham. Possibly the plaintiffs mean to hold Whigham responsible in damages on the basis of a negligence theory along the lines suggested in Rob-

erts v. Williams, 5 Cir. 1972, 456 F.2d 819, 827, modified, 456 F.2d 834. Although we think this matter should be clarified and dealt with initially by the district court, we note that there is some question whether the Eighth Amendment extends to include negligence.[35]

## IV.

## DUE PROCESS

Plaintiffs allege that corporal punishment as administered in Dade County deprives students of due process of law in violation of the Fourteenth Amendment. They claim that students are provided no procedural safeguards before corporal punishment is imposed. They further claim that corporal punishment violates due process because it is arbitrary, capricious and unrelated to the achievement of any legitimate educational purpose.

A. Policy 5144, as revised effective August 5, 1970, provides the following procedural provisions:

"If it appears that corporal punishment is likely to become necessary, the teacher must confer with the principal. The principal will determine the necessity for corporal punishment and designate the time, place and the person to administer said punishment. In any case, the student should understand clearly the seriousness of the of-

---

that, we had a conference, and it was agreed between the court and the counsel that Mr. Feinberg could present any additional evidence that he wanted to present on the two individual damage counts, then the court would take under advisement my motion for directed verdict on those two counts. Now, he ruled on those two counts that the punishment of Ingraham and the punishment of Andrews didn't rise to constitutional proportions. Ingraham got 20 licks, he had bruises, painful bruises; Andrews had 2 or 3 lickings, of no more than 5 licks each; and the judge simply decided that there was—that these didn't meet any of the four principles of Justice Brennan to rise to the dignity of cruel and unusual punishment, even taking all the evidence and construing it most favorably to the plaintiffs. Now, he said then that if he had been tried for those

two counts before a jury, and we had a right to a jury trial and had demanded it on those,—if he had been trying those before a jury, had found no federal deprivation, he could still under the pendent jurisdiction theory have allowed it to go to the jury for damages in tort. However, in this case there would be no saving of judicial time and labor because we would have to go back and have a new jury trial all over again in order to get to that point, so he dismissed all three."

35. Roberts v. Williams, 5 Cir. 1972, 456 F.2d 819, 834 (Simpson, J., specially concurring) ; Anderson v. Nosser, 5 Cir. 1972, 456 F.2d 835 (*en banc*), 842 (Simpson, J., concurring specially and joined by Gewin, Coleman, Dyer, Morgan, Clark, Ingraham and Roney, JJ.) ; Parker x. McKeithen, 5 Cir. 1974, 488 F.2d 553, 556 n. 6.

fense and the reason for the punishment. Care should be taken that the period of time between the offense and the punishment is not so long as to cause undue anxiety in the pupil."

The revision effective November 3, 1971 retains the substance of these provisions, with a few additions. Under the revision, the principal may designate an individual with whom the teacher must consult and who may direct the administration of corporal punishment. Also, the principal must maintain a log of all instances where corporal punishment is administered.

Plaintiffs in this case argue that if corporal punishment is not *per se* unconstitutional, still a child has a constitutional right to be free from unwarranted punishment. In reliance upon Dixon v. Alabama, 5 Cir. 1961, 294 F.2d 150, and later cases, the plaintiffs claim that corporal punishment in Dade County is administered without adequate procedural safeguards. The defendants apparently concede that corporal punishment in Dade County is a relatively serious punishment. In their brief they state that "Corporal punishment in the public schools of Dade County, Florida, is a last resort means of discipline as an alternative to suspension or expulsion * * *." (Defendants' Brief, p. 17.) Defendants state that a list of infractions for which corporal punishment would be administered would remove a "judgment aspect" otherwise applicable as to whether such punishment should be administered to a particular student. Defendants further say that a formal hearing would not be desirable because it would lengthen the time before punishment, and lead to undue anxiety on the part of the student involved.

The district court found that, "There is no published schedule of infractions for which corporal punishment is authorized, nor any formal procedural requirements which must be observed before punishment may be administered." In its conclusions of law, the district court stated that,

"The concept of due process is premised upon fairness and reasonableness in light of the totality of the circumstances then existing. The due process limitation does not unduly confine officials who have the responsibility of governing. Whether the constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors.

"It seems to this Court that if there is any good purpose to be served by corporal punishment in the schools, such purpose would be long since passed if formal notice and hearing were required before a paddling. There has been no deprivation of 'due process.' "

■ We agree with the district court that the full panoply of procedures associated with the judicial process are not required in determining whether to administer corporal punishment. At the same time, due process demands that the procedures followed by school officials comport with fundamental fairness. See Hannah v. Larche, 1960, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307.

The approach outlined in Whatley v. Pike County Board of Education, N.D. Ga.1971, No. 977 (unreported, three-judge district court) suggests an appropriate resolution of the due process question. In a case involving an eleven-year-old pupil, the court said:

"Where, as here, the pupil was to be promptly corrected for his transgressions, and long-term consequences stemmed only from his refusal to accept his punishment, the flexible elements of due process require only that the student know and understand the rule under which he is to be punished, and that in cases where there is doubt as to the actual offender, further inquiry be made by the school officials concerned."

If a student must "know and understand" the rule under which he is to be punished, then clearly the school authorities must tell him before he is punished

precisely what he has done which merits punishment. If the student concedes that he has engaged in misconduct, then all that remains is to determine whether corporal punishment is appropriate, and to determine the details of its administration. In Dade County, under Policy 5144, the principal or his administrative designee is responsible for making these decisions. Thus, these decisions are usually made by someone who was not directly involved in the circumstances surrounding the alleged misconduct.

If the student concedes that he has engaged in certain conduct, but claims that he did not know that such conduct was prohibited, the school authorities should proceed with caution. Inquiry should be made to determine whether the student knew or should have known that his conduct violated school rules or policies. Punishment of any sort would be patently unfair where the student was genuinely unaware of a school regulation, and had no reason to know that he was engaging in conduct which might later be used as a basis for punishment. Cf. St. Ann et al. v. Palisi et al., 5 Cir. 1974, 495 F.2d 423. The publishing of written rules of conduct would obviously eliminate many problems which might arise in this area.

If the student claims that he is innocent of the conduct which merits punishment, school officials should make sufficient inquiries to insure that, to the contrary, the student is guilty beyond any reasonable doubt. After all, once the student is corporally punished, no retraction of punishment is possible. This means that eyewitnesses should be questioned by the principal or his designee and the student should be allowed to call witnesses in his own behalf. Also, the student should be allowed to respond to the witnesses against him, and in some cases he should be accorded an opportunity to ask them relevant questions. Of course, all of this may take place in an informal setting, and no formal rules of procedure or evidence need be followed.

Examining the procedures prescribed under Policy 5144, we find them not inconsistent with the procedures we have outlined. In implementing Policy 5144, most principals probably already follow the procedural guidelines we have suggested. Of course, the testimony of students from Drew indicates that this has not uniformly been the case.[36]

B. Plaintiffs urge that corporal punishment is unrelated to the achievement of any legitimate educational purpose. The testimony of Dr. Kester supports this claim to some extent. Dr. Kester stated that could think of "no reputable authority who recommends corporal punishment" (Tr. 737), and that he could not think of "a renowned or leading authority in psychology, educational psychology, educational research, psychiatry, who advocates corporal punishment in the public schools or in the schools" (Tr. 756). He modified his position somewhat by stating the he could think of no reputable authority who recommended corporal punishment to suppress behavior "without immediately following it as soon as possible with a positive reinforcement of acceptable behavior." Dr. Kester also conceded that there might be some authorities who favored corporal punishment,[37] and that "some may say that it accomplishes the thing that I have already said that it accom-

---

36. We are particularly disturbed by the testimony that whole classes of students were corporally punished for the misconduct of a few. A number of students claimed that physical education teachers in particular would occasionally give everyone in the class one or two swats when the class was noisy, or when something was stolen. (Tr. 429–31, 591, 637–8, 647, 809–811, 873, 878.) Cf. St. Ann et al. v. Palisi et al., 5 Cir. 1974, 495 F.2d 423.

37. "As I said before, sir, I have not read of someone I consider to be an authority, a leading authority in the field, in fact I can't remember an instance, although I'm sure there is somebody who writes something somewhere who could get it in print—you can get almost anything in print—who said that corporal punishment is a good thing." (Tr. 755–756.)

plished: that you can terminate an unwanted behavior if you are willing to bear the consequences, however negative they may be" (Tr. 756). Also, counsel for plaintiffs stated that he did not propose to establish that there is not a shred of psychological or educational justification for corporal punishment.

 In light of the concessions by plaintiffs' expert and plaintiffs' counsel, and in light of other cases involving corporal punishment where there apparently was evidence of the utility of corporal punishment,[38] we are unwilling to say that mild or moderate corporal punishment is unrelated to the achievement of any legitimate educational purpose. However, in this case the severe punishment meted out at Drew went beyond legitimate bounds.

In Dixon v. Alabama, 5 Cir. 1961, 294 F.2d 150, 157, this Court stated:

"Turning then to the nature of the governmental power to expel the plaintiffs, it must be conceded * * * that that power is not unlimited and cannot be arbitrarily exercised. Admittedly, there must be some reasonable and constitutional ground for expulsion or the courts would have a duty to require reinstatement."

In a recent case, this language was explained as follows:

"This passage and the constitutional provision it elaborates do not license federal courts to review and revise school board disciplinary actions at will. Application is limited to the rare case where there is shocking disparity between offense and penalty."

Lee v. Macon County Board of Education, 5 Cir. 1974, 490 F.2d 458, 460 n. 3. In the present case, as regards Drew Junior High School, there exists "a shocking disparity" between the offenses committed by various of the students and the harsh punishment imposed by school officials. Thus, we conclude that the system of punishment at Drew not only violated the constitutional prohibition against cruel and unusual punishment, but also violated due process. Cf. Anderson v. Nosser, 5 Cir. 1972, 456 F. 2d 835 (*en banc*); St. Ann et al. v. Palisi et al., *supra*.

## V.

## RIGHT OF THE PARENT AND CHILD TO PROHIBIT CORPORAL PUNISHMENT BY SCHOOL OFFICIALS

 Paragraph 17 of the complaint alleges that following a beating administered to Roosevelt Andrews, Roosevelt's father instructed school officials to refrain from assaulting, beating or otherwise physically injuring his son. Paragraph 18 of the complaint alleges that despite these instructions, Roosevelt was later paddled by school officials. Paragraph 22 of the complaint alleges that corporal punishment abridges a student's right to physical integrity, dignity of personality, and freedom from arbitrary authority in violation of the Fourth, Ninth and Fourteenth Amendments. At trial, Phyllis Straus, the mother of four children who attend Dade County schools, testified that despite her explicit directions, her children had been corporally punished. A number of children, including James Ingraham, testified that they had refused to accept corporal punishment, but were paddled anyway. In our view, the plaintiffs clearly raised the issue of whether school officials may properly administer corporal punishment if the parent or child has objected to its administration.

In Ware v. Estes, N.D.Tex.1971, 328 F.Supp. 657, the district court dismissed an action where the plaintiffs alleged in part that the defendants administered corporal punishment without the prior permission of the parent or student in violation of the Fourteenth Amendment.

---

38. See Ware v. Estes, *supra*, 323 F.Supp. at 659; Glaser v. Marietta, *supra*, 351 F.Supp. at 557.

The district court's reasoning is revealed by the following portion of its opinion:

"Under the doctrine of Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1922), the state cannot unreasonably interfere with the liberty of parents and guardians to direct the upbringing and education of children under their control. These parental rights are not beyond limitation. Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645, 652 (1943). In order for a deprivation of due process under the Fourteenth Amendment, to occur, the rules and policies of the school district must bear 'no reasonable relation to some purpose within the competency of the State.' Pierce v. Society of Sisters, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070, 1076 (1924).

"According to the testimony, it cannot be said that the Dallas Independent School District's policy on the use of corporal punishment bears no reasonable relation to some purpose within the competency of the state in its educational function."

328 F.Supp. at 658–659. On appeal, this Court simply stated the following: "We are in agreement with the well-considered memorandum opinion of the district court * * * and its judgment is affirmed." Ware v. Estes, 5 Cir. 1972, 458 F.2d 1360.[39]

The result in *Ware* depends to some extent upon the particular circumstances revealed by the evidence in that case. In the present case, the school authorities have presented no evidence, and so have had no opportunity to demonstrate the extent to which corporal punishment is a useful or necessary disciplinary measure in Dade County.[40] In any event, the approach taken on this issue by the district court in *Ware* deserves re-examination in light of certain recent Supreme Court cases which touch on the relationship of parent and child, and the right of privacy. These cases include Stanley v. Illinois, 1972, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551; Wisconsin v. Yoder, 1972, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15; Roe v. Wade, 1973, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147. It is not appropriate at the present time to attempt to resolve this issue. Instead, we suggest that, upon remand, the district court make findings of fact and conclusions of law on this aspect of the case.

The judgments of dismissal of each of the counts of the complaint are reversed and the cases are remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

LEWIS R. MORGAN, Circuit Judge, dissents.

LEWIS R. MORGAN, Circuit Judge (dissenting):

I respectfully dissent from the holdings of the majority. I feel that the majority opinion is in conflict with our holding in Ware v. Estes, N.D.Texas, 1971, 328 F.Supp. 657, aff'd 5 Cir. 1972, 458 F.2d 1360, cert. den., 409 U.S. 1027, 93 E.Ct. 463, 34 L.Ed.2d 321. The familiar section of the Civil Rights Act under which these actions are founded, 42 U.S.C. § 1983, provides that a person acting under color of state law who deprives another of rights, privileges, or immunities secured by the Constitution shall be liable to the injured party in an action at law or suit in equity. It is, of course, essential to recovery in cases under Section 1983 that the plaintiff estab-

---

39. In Whatley v. Pike County Board of Education, D.Ga.1971 (unreported, three-judge district court), the court disagreed with plaintiff's argument that "the sanctity of the family relationship, the so-called right of privacy, and the right to physical integrity or dignity of personality" were violated by the Georgia statute authorizing corporal punishment. It is somewhat unclear exactly what the plaintiff in this case argued.

40. It is by no means certain that corporal punishment is of the same importance in every community. See, for example, Glaser v. Marietta, *supra*.

lish an invasion of federally protected constitutional rights; otherwise, there is no federal jurisdiction. Rosenberg v. Martin, 2 Cir. 1973, 478 F.2d 520. However, in a school system such as the Dade County System, with approximately 12,500 teachers and administrative personnel, a student population in excess of 242,000 pupils, and 237 schools, a disciplinary event in one school, Drew Junior High School, cannot give rise to a constitutional question and a right to have the federal courts intervene. For this reason, I would affirm the judgment of the district court which dismissed the actions.