STATE OF NEW JERSEY IN THE INTEREST OF
VIRGINIA DOE, A JUVENILE.

Juvenile and Domestic Relations Court
Camden County

Decided June 15, 1979.

586

*Ms. Valerie Anne Gray,* Deputy Attorney General, argued the case for the Division of Youth and Family Services, Department of Institutions and Agencies (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney).

*Ms. Alice Milmed Haller,* Assistant Deputy Public Defender, argued the case for the juvenile (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

PAGE, P. J. J. D. R. C. This matter is before the court on motion for reconsideration of disposition in a juvenile delinquency case. Defendant Division of Youth and Family Services (DYFS), was joined as a party on motion of counsel for the juvenile. The issue presented is the juvenile's right to treatment and the responsibility of the court and

DYFS to provide a residential treatment facility for her as an alternative to the State Training School for Girls at Jamesburg.

The juvenile, herein referred to as Virginia Doe, was committed to the State Training School for Girls at Jamesburg for an indeterminate term not to exceed three years, at a dispositional hearing in the Juvenile and Domestic Relations Court on January 25, 1979. The commitment was based on a violation of her probation, which was imposed after an adjudication of delinquency for breaking and entering. This was only Virginia's second delinquency adjudication, although she had numerous prior status offenses for running away, incorrigibility and truancy.

Virginia was first brought to the attention of DYFS and the Juvenile Court as a victim of child abuse in July 1976 when she was hospitalized as a result of a beating with an electric cord inflicted by her mother. She was placed in foster care with a goal of returning her to her mother. She ran away from the foster home and went to live with her aunt until she was placed by the Juvenile Court in Alpha House, a group home for girls in Camden. Although this placement was made directly by the Juvenile Court, it was funded by DYFS. She ran away from Alpha House and went to live with her grandmother. Her family and personal problems continued and she was placed in a foster home by DYFS in May 1977.

Virginia's first adjudication for delinquency was in July 1977 for shoplifting. She was placed on probation with the condition she remain in foster care. After again running away from the foster home Virginia was placed in shelter care at the Youth Center until she was returned to her own home in December 1977. She remained at home for the next several months, although she did not attend school on a regular basis. She had a brief stay in another foster home but returned home again in November 1978. In the same month she was picked up for breaking and entering.

On January 1, 1979 Virginia was committed to the Turrell residential program, which is a group home run by the correctional system. When she left that program without permission, a violation of her probation was filed. She was detained until commitment to the State Training School for Girls at Jamesburg on January 25, 1979.

Following her commitment to Jamesburg the Child Advocacy Unit of the Public Defender's Office took an interest in Virginia's case. They interviewed Virginia at Jamesburg and reviwed the DYFS reports. Thereafter, this motion for reconsideration of disposition was filed, together with a motion to join DYFS as a party.

After an extensive factfinding hearing this court determines Virginia's needs are clear and uncomplicated. She is a classic case of an abused child who has predictably "acted out" by running away. She is a learning-disabled child with borderline mentality. It is foreseeable that she would cross the line from the status offenses of running away to the delinquent charge of breaking and entering.

Virginia is not a "hard to place" child. There are many residential treatment facilities designed to meet her needs, either run directly by DYFS or used by it under contracts for services.

It is contended on Virginia's behalf that she has a constitutional and statutory right to treatment which should be protected by this Court.

It is further contended that Virginia should be given the opportunity to enter a residential treatment program that can provide for her needs, as an alterative to incarceration at the State Training School for Girls at Jamesburg.

DYFS contends that the Juvenile Court has no authority to direct its activities even where there is an uncontradicted need for residential treatment. DYFS does *not* contend, in this case, that an attempt is being made to allocate its financial resources in an excessive manner or that Virginia is not in need of the requested treatment. DYFS further contends

that Virginia's sole remedy to review its action is to file an appeal with the Appellate Division under R. 2:2–3 (a) (2).

The Juvenile Court system in New Jersey was established in 1903 as a separate court for the purpose of removing juveniles from the harshness of the adult criminal justice system. The court has been given broad powers to exercise as the *parens patriae* authority of the state to protect its children. Under the present statute, N. J. S. A. 2A:4–42 (b), the court is mandated:

* * * to remove from children committing delinquent acts certain statutory consequences of criminal behavior, and to substitute therefor an adequate program of supervision, care and rehabilitation; * * *.

In order to effectuate these purposes the Juvenile Court is given a wide latitude of dispositional alternatives under N. J. S. A. 2A:4–61. These alternatives specifically include the power to:

* * * Place the juvenile on probation * * * upon such written conditions as the court deems will aid rehabilitation of the juvenile; or
* * * * * * * *
Place the juvenile under the care of the Division of Youth and Family Services * * * ; or
Place the juvenile under the care and custody of the Commissioner of the Department of Institutions and Agencies for the purpose of receiving the service of the Division of Mental Retardation * * * ; or
Commit the juvenile to a suitable institution for the treatment of mental illness * * * ; or
Commit the juvenile to a suitable institution maintained for the rehabilitation of delinquents; * * * .

The intent of the Legislature to confer broad powers on the Juvenile Court is clear. The final dispositional alternative in N. J. S. A. 2A:4–61 authorizes the court to make, "Such other disposition not inconsistent with this Act as the Court may determine." *Id.*

The Juvenile Court, as described in *State in the Interest of D. B. S.*, 137 N. J. Super. 371 (App. Div. 1975) was:

* * * designed to permit the exercise of the powers of the State as *parens patriae,* for the purpose of rehabilitating youthful offenders and not of punishing them for the commission of a crime. [at 375]

The interrelationship of the Juvenile Court and the Division of Youth and Family Services is clearly established by DYFS' own enabling statute, which specifically provides that

* * * wherever in this State necessary welfare services are not available to children who are dependent or adjudged delinquent by proper judicial tribunal, or in danger of so becoming, then such services should be provided by this State * * *. [*N. J. S. A.* 30:4C-1(d)]

DYFS is further mandated under *N. J. S. A.* 30:4C-2(f) to furnish "care" to a child by providing "maintenance," which includes "moneys expended * * * to procure board, lodging * * * or any other similar or specialized commodity or service furnished to, on behalf of, or for a child."

█ DYFS contends that Virginia's sole remedy is to file an appeal of its adminstrative decision under the provisions of *R.* 2:2-3(a)(2). To limit her remedies to this procedure would completely deny to Virginia any right to treatment or ability to receive any alternatives to her incarceration. The facts of this case show that Virginia was referred, both by the court and the Probation Office, to DYFS for possible residential placement sometime prior to her commitment. The court even requested that DYFS submit a written report to it. These requests were totally ignored as were many psychological reports with similar recommendations.

It is uncontroverted that no case conferences were held or actual applications for residential treatment were made until after the Child Advocacy Unit of the Public Defender's Office moved for reconsideration. A "flurry" of activity then occurred within the week before the hearing. The latest learning disabilities test was obtained and some inquiries were made regarding possible residential facilities. At no time was any such action taken prior to Virginia's last dispositional hearing.

At a dispositional hearing on February 15, 1978 this court ordered Virginia placed under the care of DYFS "with the recommendation of residential placement." This action of the court was ignored by DYFS.

On November 15, 1978, after her arrest on the delinquency charge, this court again tried to obtain help for Virginia and directed that

The Juvenile Court of Camden County has ordered the above named juvenile placed in the care of your Agency pursuant to the provisions of *N. J. S. A.* 2A:4-62, with the recommendation of residential placement and written court report on status of case.

For the second time the order of the court was not implemented. Not even the request for a written status report to the court was respected.

It must be noted that at this time Virginia was awaiting a further hearing on the very delinquency charge for which she was ultimately incarcerated at Jamesburg. It is also reasonable to assume that had residential placement been provided as requested, either in February or November 1978, this court would have been able to avoid the strictly punitive incarceration. Three times (February 15 and November 15, 1978, and January 25, 1979) this court has requested residential placement on behalf of Virginia Doe and three times DYFS has failed to respond or even advise the court it was making no efforts to place her.

To now restrict the juvenile to an appeal from the agency inaction denies her the fundamental right of due process under our system of jurisprudence. She had no notice of the action or inaction of DYFS, and absolutely no opportunity to be heard. In sum, there is nothing to appeal because of DYFS' failure to act or provide any information to Virginia or this court on the status of her case. Virginia's interest in avoiding the complete deprivation of her liberty by incarceration is a substantial "fundamental interest" which must be protected by this court. *U. S. Const.*, Amend. XIV, *N. J. Const.* (1947), Art. I, par. 1; *cf. Nicoletta v. North*

*Jersey Dist. Water Supply Comm'n,* 77 *N. J.* 145, 162–166 (1978); *cf. In re Gault,* 387 *U. S.* 1, 87 *S. Ct.* 1428, 18 *L. Ed.* 2d 527 (1967).

If DYFS prevails here, no Juvenile Court could require that anything be done to effectuate a rehabilitative plan. A court's orders and directives could be completely ignored without any recourse, as in this case. Such a result is obviously inappropriate and would undermine all judicial authority to act.

 Virginia and this court must be given an opportunity to fully develop her available alternatives. This does not mean that she may insist upon placement in a high-priced residential facility. However, she is entitled to at least some consideration of the uncontroverted recommendations of placement within the acceptable facilities of DYFS. Furthermore, this consideration must be provided at the time of the dispositional hearing in order to avoid unnecessary incarceration.

In *State in the Interest of D.F.,* 138 *N. J. Super.* 383 (J. & D. R. Ct. 1975), the trial court found that the juvenile had both a constitutional and statutory right to treatment and ordered DYFS to place the juvenile in a specific, very expensive private institution, the costs to be borne by DYFS. The Appellate Division reversed, 145 *N. J. Super.* 381 (1976), stating that it was a mistaken exercise of discretion for the trial court to mandate a specific and expensive facility. The opinion discussed the broad powers of the Juvenile Court and DYFS, noting:

> We see nothing invalid in requiring the juvenile to submit himself to psychiatric care, either resident or outpatient, as a condition to probation where, as in this case, such care appears necessary for his well-being and in the best interest of those around him. Such disposition is made available in *N. J. S. A.* 2A:4–61(c) permitting the Juvenile Court judge to specify conditions to probation. *He can even require that DYFS choose the appropriate institution.* Attendance at a residential psychiatric facility in those circumstances will not, however, be at the cost of the State unless the facility chosen be a public one or unless DYFS, if requested, selects a private

institution which, in light of its fiscal realities, can be met out of its budget. [at 390; emphasis supplied]

The Appellate Division did hold in *D.F.* that the Juvenile Court had authority to require DYFS to act and provide residential treatment for a needy juvenile. That court specifically recognized the joint responsibility of the Juvenile Court and the State's social service agency to provide such placement and treatment for needy juveniles within the bounds of the fiscal limits of DYFS.

It must be noted that there are no such financial questions or specific expenditures of excessive funds claimed in this case. Helene Levine, Supervisor of the Residential Unit of DYFS, testified that there are a number of approved residential treatment centers within this State which would probably accept Virginia. She stated that DYFS was now willing to make referrals to six named facilities, two of which are actually operated by DYFS. Ms. Levine further stated that she had received assurance from a representative of the City of Camden School District that the district would provide its part of the financial costs of such placement and "everything should go smoothly." Moreover, the present decision to seek residential treatment for Virginia is recommended by her present caseworker, Greg Hayes, her past caseworker, Denise Smith, and the other DYFS personnel who testified at this hearing.

Virginia has not asked the court or any other person to choose a specific residential treatment facility. It is up to DYFS to exercise its discretion and choose an appropriate facility to meet Virginia's needs consistent with its budgetary responsibility.

The Juvenile Court has the authority to direct a rehabilitative plan for adjudicated children. This includes the inherent and statutory powers to require DYFS to provide specific treatment within its established procedures. This court has the responsibility to exercise this authority on behalf of Virginia Doe.

Virginia's constitutional right to treatment has also been advanced as a reason for action in this dispositional hearing. This right arises by reason of the court's use of its power to restrict her freedom as a part of its inherent *parens patriae* and statutory authority. *Nelson v. Heyne,* 491 *F.* 2d 352 (7 Cir. 1974), *cert.* den. 417 *U. S.* 976, 94 *S. Ct.* 3183, 41 *L. Ed.* 2d 1146 (1974); *Martarella v. Kelley,* 349 *F. Supp.* 575 (S. D. N. Y. 1972); *Inmates of Boys' Training School v. Affleck,* 346 *F. Supp.* 1354 (D. R. I. 1972); *Donaldson v. O'Connor,* 493 *F.* 2d 507 (5 Cir. 1974), vacated *sub nom. O'Connor v. Donaldson,* 422 *U. S.* 563, 95 *S. Ct.* 2486, 45 *L. Ed.* 2d 396 (1975).

The court in *Nelson v. Heyne, supra,* noted:

In our view the "right to treatment" includes the right to minimum acceptable standards of care and treatment for juveniles and the right to *individualized* care and treatment. Because children differ in their need for rehabilitation, individual need for treatment will differ. When a state assumes the place of a juvenile's parents, it assumes as well the parental duties, and its treatment of its juveniles should, so far as can be reasonably required, be what proper parental care would provide. Without a program of individual treatment the result may be that the juveniles will not be rehabilitated, but warehoused * * * . [491 *F.* 2d at 360]

Inherent in this principle is the "implication * * * that effective treatment must be the *quid pro quo* for society's right to exercise its *parens patriae* controls." *Martarella v. Kelley,* 349 *F. Supp.* 575, 600 (S. D. N. Y. 1972). Such controls may include the removal of a juvenile from his home and placement in a foster home, or compelling him to undergo psychotherapy or family counseling.

In return for obtaining these specific rehabilitative services Virginia has given up certain adult criminal procedural rights, including the rights to indictment and trial by jury. *In re Gault,* 387 *U. S.* 1, 87 *S. Ct.* 1428, 18 *L. Ed.* 2d 527 (1967); *McKeiver v. Pennsylvania,* 403 *U. S.* 528, 91 *S. Ct.* 1976, 29 *L. Ed.* 2d 647 (1971).

This court need not decide the pending motion on the constitutional right to treatment. This court has already determined there is statutory authority and responsibility on the part of the Juvenile Court to insure that Virginia receives a reasonable treatment plan to meet her needs. Therefore, the constitutional issue can be avoided under the principle of judicial restraint.

However, it should be noted that Virginia appears to meet all of the criteria for the exercise of this constitutional right. If there is a constitutional "right to treatment," Virginia clearly is being deprived of it. She is incarcerated at the State Training School for girls at Jamesburg where no treatment is being provided to meet her needs, according to the testimony of Priscilla Knight, the Coordinator of Juvenile Female Services for the Department of Corrections. Her testimony was corroborated by the testimony of Karen Kasick, a social worker who worked with Virginia for a brief period when she was assigned to the Training School at Skillman. All of the prerequisites which trigger the constitutional right to treatment would seem to be present in this case.

This court determines that Virginia Doe shall be recalled from the State Training School for Girls, to be placed in a residential treatment facility. Her sentence to Jamesburg will be suspended when her placement is obtained. Virginia will be placed on probation for a two-year period upon the condition that she attend and successfully complete the residential treatment program.

DYFS is directed to proceed to make all diligent efforts, including submitting application for admission, to place Virginia in a residential treatment facility reasonably designed to meet her needs. The court is willing to conduct further dispositional hearings to assist either Virginia or DYFS in carrying out the provisions of this determination.